UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| ZURICH AMERICAN LIFE INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>JON NAGEL,<br><br>    Defendant. | Civil Action No. _____<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** |

Plaintiff Zurich American Life Insurance Company ("Zurich") alleges as follows for its Complaint against Defendant Jon Nagel ("Nagel"):

## INTRODUCTION

1.  This action arises out of the unlawful possession and use of Zurich's confidential, trade secret, and proprietary information by Nagel, a former Zurich employee, as well as Nagel's retention of fraudulently obtained compensation.  Specifically, Nagel, without authorization and in direct contravention of his contractual, statutory, and common-law duties, forwarded, downloaded, and/or copied more than sixty (60) documents containing confidential, trade secret, and proprietary information regarding Zurich's business practices and personnel.  In fact, this misconduct was discovered pursuant to a separate internal investigation of Nagel where, for a period of years, he falsified timesheets, resulting in Nagel's receipt of hundreds of thousands of dollars of unearned compensation.  Accordingly, Zurich now brings this action for breach of contract, breach of fiduciary duties, misappropriation of trade secrets, and unjust enrichment to recover monetary damages, along with injunctive relief in the form of Nagel's return of Zurich's confidential and trade secret information and a forensic inspection of Nagel's electronic devices.

**THE PARTIES**

2. Zurich American Life Insurance Company ("Zurich") is an Illinois corporation and wholly owned by Zurich Holding Company of America, Inc. with its principal place of business located in Schaumburg, Illinois.

3. Zurich also maintains an office at Four World Trade Center, 150 Greenwich Street, New York, NY 10007, where, at all relevant times to this action, Nagel worked as a Zurich employee from May 22, 2017 through November 5, 2020.  Prior to that, from October 16, 2012 to May 21, 2017, Nagel worked at Zurich's office located at One Liberty Plaza, 165 Broadway Street, New York, NY 10006.  In addition, for a short period, from October 31, 2011 to October 15, 2012, Nagel worked at a Zurich office at 105 East 17th Street, New York, NY 10003.

4. Upon information and belief, Jon Nagel ("Nagel") is a citizen of and domiciled in Florida, at 2560 South Ocean Boulevard, South Beach, Florida 33480.  While working for Zurich, however, Nagel was a citizen of and domiciled in New York, previously residing at 175 East 96th Street-9N, New York, NY 10128-6204.

**JURISDICTION AND VENUE**

5. The Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because this action and controversy is between citizens of different states and exceeds the sum or value of $75,000.00, exclusive of interest and costs.  This Court also has jurisdiction over claims brought under the Defend Trade Secrets Act, pursuant to 28 U.S.C. § 1331, and this Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

6. This Court has personal jurisdiction over Nagel pursuant to CPLR § 302(a) because Nagel committed the tortious acts alleged herein and the harm felt by Zurich occurred in the State of New York.  Venue is proper in the United States District Court for the Southern District of New

York pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this action occurred in this District.

## FACTS
### Zurich's Business

7. Zurich, and its related companies, provide a wide-range of property and casualty and life-insurance products and services to individuals, domestic and foreign companies, and multinational corporations. Zurich, and its related companies, is a leading multi-line insurer operating nationwide and globally.

8. The insurance industry is highly competitive, and Zurich expends substantial resources on advertising, marketing, and promoting its products and services.

9. Further, Zurich has several forms of confidential information that give Zurich a competitive and economic advantage and allow it to maintain its esteemed reputation and highly successful operations.

10. Such confidential information includes pricing data, information and materials relating to business strategies, employee and personnel data, corporate governance documents, and organizational and planning information. Zurich protects this information by, among other things, limiting the number of persons with access to such information, restricting access to computer networks housing this information, implementing password protections on databases and documents, and requiring its employees to sign non-disclosure agreements.

### Nagel's Employment with Zurich

11. From on or about October 31, 2011, Nagel was employed as a senior associate paralegal for Zurich, at its offices in New York, New York.

12. In his capacity at Zurich, Nagel assisted and supported attorneys and management with significant, and often highly sensitive, legal matters concerning, among other things,

corporate governance and regulatory compliance.  As part of this work, Nagel routinely had access to confidential and proprietary information of Zurich, including nonpublic internal governance and personnel information.

13. More specifically, Nagel's duties included preparing, reviewing and compiling Zurich Board of Directors and Audit Committee materials for quarterly meetings for Zurich and its related companies. These materials would have included highly confidential information including, but not limited to, meeting minutes, financial reports, risk information, audit plans, compliance plans, and investment transaction information.  In a similar vein, Nagel was responsible for information related to the election of officers and directors for Zurich and its related companies, which included the handling of sensitive personal identification information (i.e., social security numbers, biometric information, dates of birth).

14. Accordingly, in connection with his employment, Nagel signed an "Agreement Relating to Proprietary Information/Equipment/Work Development" (the "Proprietary Information Agreement" or the "Agreement") on or about October 31, 2011.  A true and correct copy of the Agreement is attached hereto as Exhibit A.

15. Under the Proprietary Information Agreement, Nagel promised to "use [his] utmost diligence to guard and protect Proprietary Information" of Zurich.  (Exhibit A § I.B).  Nagel further agreed that "Proprietary Information," pursuant to the Agreement includes, *inter alia*,

> [I]nformation of a business nature including but not limited to, marketing, pricing, claims, financial, strategic, risk engineering, underwriting, employee data, and planning and organizational data.

(*Id.* § I.A).

16. Nagel acknowledged that Proprietary Information protected under the Agreement could be proprietary to Zurich, as well as that of third parties, "such as vendors, agents, policyholders, and claimants." (*Id.*).

17. Pursuant to the Agreement, Nagel expressly agreed that during and after his employment with Zurich, he would not "disclose, use for [himself] or others, make unauthorized copies of, alter or modify in anyway [sic], or take with [him] such Proprietary Information." (*Id.* § I.B).

18. Nagel further agreed that upon Zurich's request or termination of his employment, he would "immediately return all Proprietary Information to [Zurich] . . . including but not limited to all documents, records, files, data, reports, notebooks, lotus notes, tapes, memoranda, diskettes, CDROM, or other physical or electronic medium." (*Id.* § I.E).

## Nagel's Falsification of Timesheets and Misuse of Zurich Confidential, Trade Secret, and Proprietary Information

19. As a Zurich employee, Nagel was responsible for self-reporting his time. Nagel was eligible, subject to approval, to receive additional premium compensation for overtime work.

20. In the course of a review of budget and compensation information related to minor reorganization efforts, Zurich observed that compensation to Nagel was significantly higher than expected. Consequently, in or about October 2020, Zurich conducted an internal review of Nagel's self-reported timesheets. The review ultimately revealed that Nagel was consistently falsifying timesheets by reporting overtime that he did not work.

21. For example, the timesheets showed that Nagel worked from 6:45 a.m. to 9:00 p.m. nearly every work day for months and years. Nagel routinely, and nearly without exception, reported exactly 5.75 hours of overtime worked each day.

22. While the sheer consistency of the reported overtime creates more than an inference of falsification, an examination of Nagel's arrival at the Zurich offices—as monitored by employee-badge access records—further established that he did not work the long hours he reported.

23. Tellingly, too, for more than a week during which Nagel reported working from 6:45 a.m. to 9:00 p.m. each day, he later conceded that he was driving from New York to Florida during that time period for personal, non-business reasons.

24. Further, on Fridays during the summer months, Nagel reported working until 11:00 p.m., but later admitted during the investigation that he did not actually work the additional hours he reported.

25. Zurich's investigation of Nagel's conduct showed a pattern of falsification starting as far back as 2013, resulting in over $750,000 in overtime compensation unduly paid to Nagel.

26. During the course of its investigation into Nagel's time-entry falsifications, Zurich also looked into Nagel's activity on his work email account.

27. This inquiry unearthed further misconduct. Specifically, the review of Nagel's work email revealed that, in addition to falsifying timesheets, Nagel was performing personal business during time he reported working for Zurich and was using Zurich resources to conduct such personal business.

28. Even more alarming, Zurich discovered that Nagel sent, without authorization, more than sixty (60) documents containing Zurich confidential and proprietary information to his personal, non-work email account, "nagelamerica@gmail.com."

29. In particular, from approximately March to November 2020, Nagel sent over sixty (60) emails to his personal, non-work email account attaching highly sensitive materials, including

6

but not limited to, corporate governance documents, board resolutions, biographical affidavits containing sensitive personal information for Zurich senior executives, and financial reports.

30. Nagel was not authorized, and had no legitimate business reason, to send these documents to his personal email account.

31. Critically, as well, these materials constitute "Proprietary Information" of Zurich and/or third parties under the Proprietary Information Agreement.

### Nagel's Termination and Refusal to Return Zurich Confidential, Trade Secret and Proprietary Information

32. Upon learning of the scope of Nagel's misconduct, on November 5, 2020, Zurich terminated Nagel's employment for cause, effective immediately.

33. Shortly thereafter, on November 6, 2020, Zurich sent a letter to Nagel reminding him of his obligations to Zurich, as provided in the Proprietary Information Agreement. A true and correct copy of the November 6 letter is attached hereto as Exhibit B.

34. Zurich's November 6 letter demanded that Nagel return all hard-copy documents containing Zurich confidential and proprietary information and submit his computer, phone, and other electronic devices, as well as his personal email account(s), for imaging and forensic analysis to ensure the return of all Zurich confidential and proprietary information. (*See* Exhibit B).

35. Nagel has acknowledged receipt of Zurich's demand but has, nonetheless, refused to return the Zurich confidential and proprietary information.

36. Specifically, on November 11, 2020, Thomas Budd, Nagel's attorney, contacted counsel for Zurich confirming receipt of Zurich's November 6 letter but declined to return the documents or submit Nagel's computer to forensic inspection. A true and correct copy of this communication is attached hereto as Exhibit C.

37. Mr. Budd, without justification, stated that Nagel would only "provide assurances that there is no Company material on his personal Computer," if Zurich agreed to provide Nagel severance pay and "clear" Nagel's "record" regarding the termination of his employment. (*See* Exhibit C).

38. Not only is there no contractual or legal basis for Nagel's request for severance pay, this demand is unconscionable given that Nagel's termination for cause arose from his falsifying timesheets and receipt of hundreds of thousands of dollars in unearned overtime compensation.

39. Nagel is, therefore, using the Zurich confidential and proprietary information he unlawfully obtained to benefit himself by exploiting it and unjustifiably using it as leverage to acquire a severance payment to which he is not otherwise entitled.

40. Further, Nagel's refusal to return the confidential and proprietary information to Zurich has harmed, and threatens to continue to harm, Zurich's goodwill, reputation, and competitive and business advantages.

41. For example, if Nagel discloses this information—whether intentionally or inadvertently—to a Zurich competitor, the competitor could use the information to unfairly compete with Zurich, divert its customers, and undercut its business.

42. A third-party disclosure—even an inadvertent disclosure—while in the hands of Nagel could also result in the disclosure of personal and highly sensitive information of Zurich employees, compromising Zurich's business reputation and the trust it has cultivated with its personnel.

## COUNT I
## BREACH OF CONTRACT

43. Zurich repeats and re-alleges the allegations contained in Paragraphs 1 through 42 as if set forth fully herein.

44. The Proprietary Information Agreement Nagel entered into with Zurich constitutes a valid and enforceable contract.

45. Zurich has fully performed all of its obligations and duties under the Proprietary Information Agreement.

46. Under the Agreement, Nagel agreed that, during and after his employment with Zurich, he would not "disclose, use for [himself] or others, make unauthorized copies of, alter or modify in anyway [sic], or take with [him] such Proprietary Information."  (Exhibit A § I.B).

47. Despite these express obligations, and in breach of the Proprietary Information Agreement, Nagel, without authorization, forwarded, downloaded, and/or copied more than 60 documents containing Zurich confidential and proprietary information.

48. Nagel further used, and continues to use, the Zurich confidential and proprietary information he unlawfully obtained to his benefit by, among other things, unjustifiably withholding it from Zurich and attempting to use it as leverage to secure a severance payment to which he is not otherwise entitled.

49. Under the Proprietary Information Agreement, Nagel also agreed that upon Zurich's request or termination of his employment, he would "immediately return all Proprietary Information to [Zurich]."  (Exhibit A § I.E).

50. Zurich has demanded that Nagel return the Zurich confidential and proprietary information in his possession and allow a forensic inspection of his computer and other electronic devices to ensure that the information has not been otherwise retained and/or further disseminated by Nagel.  Nagel has, nonetheless, refused to return the Zurich confidential and proprietary information, in violation of the Proprietary Information Agreement, or agree to a forensic inspection of his electronic devices.

51. Zurich's goodwill, reputation, and business and competitive advantages have been damaged by Nagel's breaches of the Proprietary Information Agreement.

52. As a result of Nagel's breaches and threatened continued breaches, Zurich has been irreparably injured, and continues to face irreparable injury.  Zurich is threatened with loss of goodwill, damage to its reputation, and diminishment of its business and competitive advantages in the insurance industry, for which a remedy at law is inadequate.

53. Accordingly, Nagel must be enjoined and restrained by order of this Court. Specifically, given the volume of documents at issue and Nagel's record of surreptitious and fraudulent conduct, his mere assurances that he will delete such stolen information are wholly insufficient.  In other words, a forensic analysis of Nagel's personal electronic devices is essential to ensure that no Zurich confidential or proprietary information remains in his possession, is subject to his continued misuse, or has been otherwise further disseminated by Nagel.

54. To the extent a remedy at equity is inadequate, Zurich seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and interest.

## COUNT II
## BREACH OF FIDUCIARY DUTIES

55. Zurich repeats and re-alleges the allegations contained in Paragraphs 1 through 54 as if set forth fully herein.

56. As an employee of Zurich, Nagel owed Zurich fiduciary duties, including but not limited to the duty to act with the utmost good faith and loyalty toward Zurich, the duty of trust and confidence, and the duty to refrain from disclosing or exploiting Zurich's confidential and proprietary information for his own benefit, or to Zurich's detriment.

57. By reason of the foregoing, Nagel breached the above-described fiduciary duties owed to Zurich by, among other things, unlawfully forwarding, downloading, and/or copying Zurich confidential and proprietary information; refusing to return Zurich confidential and proprietary information; and exploiting and misusing Zurich confidential and proprietary information by withholding it in an attempt to force Zurich to pay him severance.

58. Zurich's goodwill, reputation, and business and competitive advantages have been damaged by Nagel's breaches of his fiduciary duties.

59. As a result of Nagel's breaches and threatened continued breaches, Zurich has been irreparably injured, and continues to face irreparable injury. Zurich is threatened with loss of goodwill, damage to its reputation, and diminishment of its business and competitive advantages in the insurance industry, for which a remedy at law is inadequate.

60. Accordingly, Nagel must be enjoined and restrained by order of this Court. To the extent a remedy at equity is inadequate, Zurich seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and interest.

## COUNT III
## ACTUAL AND/OR THREATENED MISAPPROPRIATION
## OF TRADE SECRETS
## (DEFEND TRADE SECRET ACT, 18 U.S.C. § 1836)

61. Zurich repeats and re-alleges the allegations contained in Paragraphs 1 through 60 as if set forth fully herein.

62. Zurich's confidential and proprietary information includes, among other things:

computer software programs, related documents, systems security access codes and access passwords, as well as Company information of a business nature including but not limited to, marketing, pricing, claims, financial, strategic, risk engineering, underwriting, employee data, and, planning and organizational data[.]

63. This information constitutes trade secrets, pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, because Zurich derives independent economic value from

this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

64. Zurich's trade secrets relate to information used in interstate and/or foreign commerce.

65. Nagel actually misappropriated and/or threatens to inevitably misappropriate Zurich's trade secrets without its consent, in violation of federal law. Among other things, Nagel forwarded Zurich's trade secret information to personal e-mail for unauthorized use on multiple electronic devices, which he has refused to return after his employment with Zurich ended and, thus, after he was obligated to return such information. Indeed, no valid basis exists for Nagel to retain any Zurich property. Further, Nagel admits to copying Zurich information to personal email, which was accessed from personal electronic devices. Zurich has serious concerns regarding Nagel's use and disclosure of such information.

66. In addition to the electronic data that Nagel continues to possess without any valid basis or justification, Nagel is intimately familiar with Zurich's internal business structure and governance based on his duties and responsibilities. As detailed herein, Nagel had regular responsibilities with respect to meeting minutes, financial reports, risk information, audit plans, compliance plans, and investment transaction information. In a similar vein, Nagel was responsible for information related to the election of officers and directors for Zurich and its related companies, which included the handling of sensitive personal identification information. None of this information is publically available and would be incredibly harmful to Zurich if disseminated or used in any way.

67. Unless restrained, Nagel will continue to use, divulge, disclose, acquire and/or

otherwise misappropriate Zurich's confidential and trade secret information.

68. Given that Nagel refuses to return Zurich's information subsequent to termination of his employment, it is reasonable to conclude that Nagel does not intend to comply with the DTSA.

69. Consequently, Nagel's actions constitute the actual and/or threatened misuse of Zurich's confidential and trade secret information.

70. Zurich seeks an order enjoining Nagel from accessing, using or possessing Zurich confidential and trade secret information, and further requests an order requiring Nagel to return any and all such information to Zurich.

71. Finally, Nagel's actual and threatened misappropriation has been willful and malicious. Specifically, Nagel violated his Agreement with Zurich by retaining and/or utilizing Zurich's trade secrets and confidential information after his termination and failing to return such confidential information upon its demand has been willful and malicious.

72. Nagel's actions have also damaged Zurich's goodwill, reputation, and legitimate business interests.

73. As a result, Zurich is entitled to recover not only compensatory damages, but also punitive damages and attorneys' fees resulting from Nagel's wrongful conduct in violation of the DTSA.

74. As a result of the threatened and/or actual misappropriation of Zurich's trade secrets, it has been injured and faces irreparable injury unless Nagel is enjoined and restrained by order of this Court.

## COUNT IV
## UNJUST ENRICHMENT

75. Zurich repeats and re-alleges the allegations contained in Paragraphs 1 through 74 as if set forth fully herein.

76. By his acts and/or omissions, as alleged herein, Nagel has been enriched at the expense of Zurich.

77. Nagel has knowingly received a benefit, namely the approximately $750,000 in unearned overtime compensation, under circumstances making it inequitable for Nagel to retain such benefit.

78. In other words, Nagel has been unjustly enriched by virtue of his falsifying timesheets resulting in his receipt of undue overtime compensation, and such retention of unearned monies violates fundamental principles of justice, equity, and good conscience.

79. As a direct and proximate result of Nagel's unjust enrichment, Zurich is entitled to restitution and/or disgorgement of the unearned compensation paid to him.

## REQUEST FOR RELIEF

WHEREFORE, Zurich respectfully requests judgment in its favor and against Nagel awarding Zurich the following relief:

(a) An order enjoining and restraining Nagel from possessing, using, disclosing, or having access to Zurich confidential, trade secret, or proprietary information and requiring Nagel to return all Zurich confidential or proprietary information in his possession, custody, or control to Zurich;

(b) An injunction order requiring Nagel to submit all of his computers, tablets, mobile phones, electronic storage devices, and/or other media, for imaging and forensics analysis;

(c) An injunction order requiring Nagel to provide access to all of his personal email accounts for imaging and forensics analysis;

(d) Awarding Zurich actual, incidental, compensatory, and consequential damages to be proven at trial;

  (e)  Awarding Zurich exemplary or punitive damages in an amount to be proven at trial due to Nagel's willful and malicious activities;

  (f)  Awarding Zurich its costs and expenses incurred herein, including reasonable attorneys' fees and interest, pursuant to the Defend Trade Secrets Act.

  (g)  An order requiring Nagel to disgorge the unearned compensation paid to him, plus prejudgment interest;

  (h)  Such further relief as the Court may deem just and equitable.

DATED this 30th day of December, 2020.

        Respectfully submitted,

        ZURICH AMERICAN LIFE INSURANCE COMPANY

        By: /s/ *Jeremy A. Cohen*

        Jeremy A. Cohen
        SEYFARTH SHAW LLP
        620 Eighth Avenue, 32nd Floor
        New York, NY
        P: (212) 218-5500
        F: (212) 218-5526

        Noah A. Finkel (to be admitted *pro hac vice*)
        Robyn Marsh (to be admitted *pro hac vice*)
        SEYFARTH SHAW LLP
        233 South Wacker Drive, Suite 8000
        Chicago, IL 60606-6448
        P: (312) 460-5000
        F: (312) 460-7000
        rmarsh@seyfarth.com

        *Attorneys for Plaintiff*
        *Zurich American Life Insurance Company*