UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
ZURICH AMERICAN LIFE INSURANCE CO.   :
and ZNA SERVICES LLC,                :
                                     :
        Plaintiffs/Counter-Defendants, :        20-cv-11091 (JSR)
                                     :
            -v-                      :           MEMORANDUM ORDER
                                     :
JON NAGEL,                           :
                                     :
        Defendant/Counter-Claimant.  :
------------------------------------ x
JON NAGEL,                           :
                                     :
        Counter-Claimant,            :
                                     :
            -v-                      :
                                     :
CENTRE GROUP HOLDINGS (U.S.)         :
LIMITED, et al.,                     :
                                     :
        Counter-Defendants.          :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

        This case arises out of an employment dispute.
Plaintiff/Counter-Defendant Zurich American Life Insurance Company
("ZALICO") fired defendant/counter-claimant Jon Nagel in November
2020. According to ZALICO, Nagel was fired for, inter alia,
falsifying timesheets and emailing Zurich proprietary information
to his personal email. According to Nagel, he was fired because he
was 69 years old. At the end of December 2020, Nagel filed suit
against Zurich entities and individual employees in New York state
court alleging age discrimination, and ZALICO filed suit against

Nagel in the Southern District of New York alleging breach of contract and other claims and seeking return of its proprietary information. The two cases were consolidated before this Court when Nagel filed his age discrimination and other claims as counterclaims in this action.

Now before the Court are the parties' cross motions for summary judgment on plaintiffs' breach of contract, breach of fiduciary duty, and fraud claims against Nagel, as well as on Nagel's counterclaims for defamation, tortious interference with contract, and age discrimination and retaliation. ECF Nos. 93 and 98. As the Court stated by "bottom-line" order dated February 28, 2021, see ECF No. 121, the Court denies both parties' motions for summary judgment on plaintiffs' claims for breach of contract, breach of fiduciary duty, and fraud, but the Court grants summary judgment in favor of counter-defendants on Nagel's counterclaims for defamation, tortious interference, age discrimination, and retaliation. This Memorandum Order sets forth the reasons for these rulings.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 Statements, Counterstatements, declarations, exhibits, and affidavits, and are undisputed unless otherwise indicated.

I.   **Factual Background**

In September 2005 Nagel began working for Zurich Capital Markets, Inc. as a Corporate Secretary, an exempt employee, i.e., paid an annual base salary. Nagel was 55 years old at the time. Around January 2009, ZNA Services offered Nagel a role as a Corporate Secretary, which was also an exempt employee position with an annual base salary. At the end of May 2011, Nagel's employment with ZNA Services was terminated due to a reduction in force. Nagel received 16 weeks of severance, totaling about $43,000.

At the end of October 2011, however, Nagel was rehired by ZALICO as a senior associate paralegal, a non-exempt position paid by the hour. At the time he was re-hired, Nagel was 60 years old. In 2013, Nagel took on additional governance work for the ZLS entities, supervised by Ali Rifai. The arrangement was that he would continue his regularly scheduled work for ZALICO, supervised by Carty, and his work for the ZLS entities would be in overtime hours.

In March 2020, on account of the COVID-19 pandemic, Nagel began working from home.

A. Handling Proprietary Information

In connection with his 2011 re-hiring, Nagel signed a Proprietary Information Agreement under which Nagel promised to

-3-

"use [his] utmost diligence to guard and protect Proprietary Information," which the Agreement defines as including "information of a business nature including but not limited to marketing, pricing, claims, financial, strategic, risk, engineering, underwriting, employee data, and planning and organizational data." ECF No. 97-4 § I.A. Pursuant to the Agreement, Nagel expressly agreed that during and after his employment with Zurich, he would not "disclose, use for [himself] or others, make unauthorized copies of, alter or modify in anyway [sic], or take with [him] such Proprietary Information." Id. § I.B. Nagel also agreed that upon Zurich's request or the termination of his employment, he would "immediately return all Proprietary Information to [Zurich] . . . including but not limited to all documents, records, files, data, reports, notebooks, lotus notes, tapes, memoranda, diskettes, CDROM, or other physical or electronic medium." Id. § I.E.

In his role for the ZLS entities, Nagel handled corporate governance for certain Zurich entities, such as being responsible for reviewing, compiling, and organizing Zurich Board of Directors and Audit Committee materials for quarterly meetings for Zurich and its related companies. This involved being exposed to Zurich's proprietary information. For example, Nagel was responsible for information related to the election of officers and directors for

-4-

Zurich and its related companies, which included handling sensitive personal identification information of officers and directors (i.e., social security numbers, biometric information, and dates of birth) in biographical affidavits.

Zurich also had a Flex Work and Telecommuting Policy, which states that when an employee's employment ends, the employee must return all Zurich property within two days of the separation date, and that a terminated employee "[is] not to retain or otherwise keep Zurich confidential or proprietary information." ECF No. 97-15.

Nagel was required to complete annual training on compliance with Zurich's confidentiality policies, and upon completion of such training was required to agree and acknowledge, inter alia, that "[he] may not send Zurich business information to [his] personal email account," "that [he] may not register for non-work related and personal external websites using [his] Zurich email address," "that [he] may not use [his] Zurich email address as a login to external systems for personal, non-work related use," and finally, that "[he] may not store or save Zurich business information to non-Zurich equipment, or unapproved external services such as unapproved third party cloud storage providers." ECF Nos. 97-16, 97-17.

After the onset of the COVID-19 pandemic, Zurich published "Work From Home Guidance for Legal Services," applicable to Nagel in his role as a senior paralegal. The Guidance provided that individuals working in Legal Services would continue to need to be "vigilant" about protecting Zurich confidential information, and that employees are to "refrain from sending company information to your personal email account, including for printing purposes." ECF No. 97-18. The Guidance also provided that if printing was necessary, employees could connect their company laptops to a home printer with a USB cord. Id.

B. Self-Reporting Time

As a Zurich non-exempt employee, Nagel was responsible for self-reporting his time. He recorded and transmitted his time to Zurich using its SharePoint and GEMS time-reporting systems.[1] Zurich managers reviewed their employees' time, including supervising their reported overtime. The SharePoint system is for an employee to record regularly scheduled hours; the GEMS time-keeping system is for "exception time" only, for anything that is

---

[1]   Nagel disputes that the timecards were meant to literally report the hours he worked, arguing instead that they were meant to reflect how he split his time between ZALICO and the ZLS entities. The record evidence does not support such an assertion; the memo from Ali Rifai reflects only that Nagel's work for the ZLS entities would be in overtime hours, and that Rifai would not have been surprised that Nagel reported considerable overtime hours given his work for the ZLS entities. See ECF No. 104-2.

not an employee's regularly scheduled work, including for overtime, vacation, or illness. All non-exempt employees, such as Nagel, were eligible to receive additional premium compensation for overtime. The Overtime Policy states that "[a]ll the time you work is counted to determine if you receive overtime pay. You must record all time worked, including overtime, whether approved in advance or not, on your time sheet and in the GEMS Timekeeping System." ECF No. 97-25. In reporting his exception time in GEMS, Nagel affirmed on his weekly timesheets as follows: "I represent by signing below that I have correctly recorded my time worked for the dates shown. I acknowledge that accurate time recording is an important responsibility of my job, and that falsifying timesheets is a serious violation of company policy that may result in immediate discharge. I understand that if I have any questions about how to complete my timesheet or submit my overtime hours in GEMS, I should consult my manager, who will either assist me or refer me to someone else for assistance." ECF No. 97-29. Nagel understood that if employees submitted any false information or were untruthful to Zurich, it would be grounds for discipline.

In Nagel's 2013 performance review, Carty gave Nagel a high rating and also noted that "Jon has been accustomed to much more overtime. This was significantly curtailed this year as a result of GEP target, and Jon was less supportive of this initially and

-7-

now his support is total and unhesitating and much appreciated." ECF Nos. 97-19, 97-20. Nagel's response to this review stated that "this objective was prescribed by corporate center and accordingly, all efforts orchestrated to achieve the GEP savings target have been supported." Id. Nagel testified that Carty would "give excuses" about budget constraints and the inability to give significant raises in compensation. See ECF No. 94-11 at 198:14.

Nagel testified that his timesheet "never does" reflect the time he was actually working. See ECF No. 114-10 at 249:14-16. Badge access reports from Zurich's World Trade Center office building in New York showed that, although Nagel stated on timesheets that he clocked in to work at 6:45 a.m., Nagel did not arrive at Zurich's offices from several minutes to several hours after the time he self-reported that he started work.[2] ECF No. 97-38.

C. Investigating Possible Violations of Zurich Policies

Nagel was also subject to Zurich's Anti-Fraud Policy, under which any violation, including "impropriety," is grounds for termination; the policy defines "impropriety" to include "theft, false claim, kickback, conflict of interest, or other illegal or

---

[2]    In his deposition, Nagel stated that he recorded a 6:45 a.m. start time because Zurich's new timekeeping system required him to record 30 minutes for lunch, even though he only took 15 minutes. See ECF No. 114-10 at 163:3-11.

unauthorized action in which Zurich's financial assets are diverted, proprietary or confidential Zurich information is misused, employee integrity is compromised, or Zurich operations are disrupted." ECF No. 97-28.

Employees are required to acknowledge, upon hire and annually thereafter, that they have read the Zurich Code of Conduct and agree to be bound by its provisions and other internal policies, including those described above. The Code of Conduct also includes an anti-discrimination policy and provides for various reporting avenues for complaints of harassment or discrimination. At no time during his employment did Nagel report a violation of Zurich's anti-harassment and anti-discrimination policy, or otherwise raise discrimination complaint to anyone at Zurich.

If there is an issue with compliance with Zurich's policies, Zurich has an established process for resolving any such issue, as laid out in its Internal Investigation and Fact Finding Policy. That Policy provides that Zurich may initiate and conduct an internal employee investigation when Zurich learns of an allegation of employee conduct or unprofessional behavior, including where someone allegedly violates a company policy related to safety and security issues, misuse of company property or equipment, or fraud or theft (which expressly includes falsifying timesheets). ECF No. 97-6. Human Resources often works

with Zurich's Corporate Investigations and Security Services ("CISS") team, which, among other tasks, investigates internal fraud and misconduct related to employees, vendors, or brokers. CISS has investigated other employees for fraud, and other employees have been terminated from employment for fraud or misconduct.

1. *2014-15 Audit*

In 2015, several Zurich HR or Employee Relations employees -- Audrey Martin, Mary Ratzloff, and Lisa Baltazar -- looked at several months of Nagel's overtime reporting (from October 7, 2014 through January 9, 2015), then a sample of three months comparing his time reporting to his badge-access records (February, April, and July of 2014) to look at Nagel's reported evening hours. ECF 104-4. Zurich took no action at that time. Nagel was not aware of the 2014-2015 review until this litigation. See ECF No. 102 ¶ 35.

2. *2020 Investigation*

In the fall of 2020, in the course of a routine review of budget and compensation information related to ZALICO monthly expenses for the legal department for the upcoming 2021 year, Executive Vice President, Chief Legal Officer, and ZALICO Corporate Secretary Laura Lazarczyk observed that monies budgeted for overtime were "unusually large" given that there was only one

overtime-eligible person on the ZALICO legal team -- Nagel.[3] Based
on this, Lazarczyk then requested that Jon Dahlborg, Vice President
and head of HR Employee Relations for Zurich North America,
investigate Nagel's self-reported timesheets.[4] Dahlborg assigned
Lazarczyk's request to a member of the Employee Relations team,
Senior Employee Relations Consultant Cheryl Pappas. Carty was not
involved in the investigation, which was conducted solely by Pappas
in Employee Relations and Edward Urban from CISS.

   i. *Timecards*

  Pappas testified that to conduct her investigation, she
logged into the SharePoint site and reviewed one year's worth of
Nagel's timecards. ECF No. 94-23. Pappas testified that in
reviewing the timecards, she observed that Nagel consistently

---

[3] Nagel disputes that Lazarczyk "stumbled across" this
information, causing Zurich to begin an investigation, alleging
instead that "[a] decision to terminate Nagel had already been
made." See ECF No. 112 at 26-27. Nagel does not, however, point
to any evidence to create a genuine dispute of material fact on
this issue. He points to the fact that the overtime compensation
line was highlighted on the spreadsheet Lazarczyk reviewed to argue
that she did not "discover" that the overtime billing was unusually
large, see ECF No. 111-23 (Ex. 23); he also points to a memo from
Ali Rifai about how Nagel's work for the ZLS entities would be
overtime hours to argue that Lazarczyk would not be the one
reviewing his overtime hours, see ECF No. 104-2. Neither creates
a genuine issue of material fact on this question.

[4] Nagel argues that the whole investigation was pretext, but,
as discussed in more detail *infra*, does not point to evidence
sufficient to create a genuine issue of material fact on this
point.

reported overtime such that the day-to-day, week-to-week amounts reported were "very similar." Id. 52:2. Pappas testified that she also observed that Nagel reported the exact same start time (6:45 a.m.) and end time (9:00 p.m.) on Monday through Thursday, and that nearly every Friday during the summer, had an end time of 11:00 p.m., with very few exceptions, paid time off, or changes to this schedule throughout the year.[5] Id. Pappas testified that as a result, she requested an overtime report from the Payroll Department to "validate that Mr. Nagel had turned in all the hours he was reporting on his timecards."[6]

---

[5]   During summer 2020, Nagel reported working until 11:00 p.m. to account for Zurich's summer-Fridays policy, which allowed employees to leave two hours early based on their regular work schedule.

[6]   For all the assertions in this paragraph, Nagel argues that for purposes of summary judgment, the court cannot rely on Pappas's testimony because she is an interested witness. Nagel puts forth no other evidence to dispute Pappas's testimony beyond his general argument that the whole investigation was drummed up to cover up age discrimination in his termination. While testimony from Pappas as to her purpose or intent in taking any of these steps should not be grounds for summary judgment as testimony from an interested witness, the court is free to consider what she observed about Nagel's hours, as supported by other evidence in the record about his timecards and reported hours. See, e.g., Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000) ("That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." (internal quotation marks and citation omitted)); In re Dana Corp., 574 F.3d 129, 152-53 (2d Cir. 2009) (citing Reeves).

On October 7, 2020, a Payroll Department employee provided Pappas with the requested report, generated from the GEMS timekeeping system, which showed Nagel's overtime from his re-hire in 2011 to the present. In her role, Pappas had requested and received these types of reports from the Payroll Department numerous times; for example, in the year 2020 she requested at least twenty reports. Upon receiving the requested report, Pappas reviewed its contents and prepared a summary of her observations to send in an email to Dahlborg, her manager. Pappas made several observations: that Nagel routinely, and nearly without exception, reported exactly 5.75 hours of overtime worked each day, except for "summer Fridays," when he reported exactly 7.75 hours of overtime; that, for example, in the period from January 2, 2020 to April 30, 2020, Nagel reported working overtime on 86 days -- every weekday during this period -- and that on each of those days, Nagel again stated that he worked exactly 5.75 hours of overtime; and that Nagel's overtime earnings had been very close to or exceeded the amount of his base salary for numerous years, including, for example, that in 2019, Nagel had a base salary of $109,179, and

reported overtime earnings that same year in the amount of $113,005.06.[7]

Pappas testified that she sought to review additional information, specifically Nagel's Zurich email activity, to validate the time that Nagel was turning in, since he reported working from 6:45 a.m. until 9:00 p.m. on a consistent basis.[8] Pappas contacted Edward Urban, an internal fraud coordinator and investigator on Zurich's CISS team, to assist.[9] Urban had already opened an investigation into Nagel on October 29, 2020, pursuant to another inquiry from Tracey Willis in Employee Relations regarding Nagel's use of the corporate credit card.

Pappas requested a log-in/log-out report of Nagel's online activity. Pappas also learned from the Payroll Department that Nagel had changed his mailing address from New York to an address in Florida. After receiving such information, Pappas requested a VPN connection report of Nagel's location when accessing Zurich's system to do work. Records tracking the VPN connection on Nagel's

---

[7]    Nagel argues that Pappas's email to Dahlborg, see ECF No. 97-32, is inadmissible evidence because it is hearsay to which no exception applies. Nagel's argument does not, however, explain why Pappas's observations based on the payroll report would not be admissible for summary judgment purposes.

[8]    Nagel denies that this was done on any good-faith basis.

[9]    Nagel denies that this was done for any legitimate purpose.

-14-

Zurich-issued computer confirmed that Nagel was traveling from New York to Florida from approximately September 25, 2020, to October 3, 2020. Nagel stated on his GEMS timesheets that during this period, he worked from exactly 6:45 a.m. to 9:00 p.m. on each workday. Pappas's review of the VPN report showed that Nagel was logging on to Zurich's systems in New York, New Jersey, North Carolina, Georgia, and then Palm Beach, Florida.

   ii.  *Email & Printing*

CISS also looked at Nagel's activity on his work email account. Zurich found that Nagel was performing personal business during time he reported to be working for Zurich and was using Zurich resources to conduct personal business, including two gin businesses—Palm Beach Gin and Greenwich Gin. ECF No. 97-34; ECF No. 94-9 at 127:8-129:24.[10] On October 29 and 30, CISS also found that Nagel sent, without authorization, more than sixty documents containing Zurich proprietary information to his personal, non-work email (Gmail) account.[11] From approximately March to November 2020, Nagel sent over sixty emails to his personal, non-work email account including board resolutions, biographical affidavits

---

[10]   Nagel denies this, without citing to record evidence that contradicts either the CISS report or Urban's testimony. <u>See</u> ECF No. 112 at 40.

[11]   Nagel disputes that doing so violated any Zurich policy.

containing sensitive personal information for Zurich senior executives, and financial reports. This included the biographical affidavit of Laura Lazarczyk. In the past year, Lazarczyk has received two notifications from the State of Illinois regarding fraudulent unemployment claims made in Lazarczyk's name.[12] Nagel averred and testified that he sent that email to accomplish work duties. See ECF No. 113 ¶¶ 11-20; ECF No. 114-10 at 102:18-24.

Nagel tried to get help from Zurich's IT Department to set up his printer so that it would print directly from his work laptop. See ECF No. 114-23. His declaration provides that when he could not get a timely response to resolve the issue, he began emailing company documents to his personal email address in order to print them from his personal device. See ECF No. 113 ¶ 12. His declaration states that he had to print and mail time-sensitive documents to accomplish his duties as a board officer of multiple Zurich entities, see ECF No. 113 ¶¶ 14-18; but plaintiffs dispute that there was any work reason for Nagel to print documents because there was another employee specifically tasked with the relevant responsibility for printing and mailing documents, see ECF No. 107 at 16. Carty had previously told Nagel not to send "sensitive

---

[12]    Lazarczyk further testified that she did not know whether Nagel's actions caused these two notifications. See ECF No. 111-4 at 95:18-21.

company information to his personal email."[13] ECF No. 94-6 at 182:6-24, 184:17-22. Carty found for Nagel another employee who worked in the Schaumburg Zurich offices who could print and handle the mailing of sensitive company information for regulatory purposes, so that Nagel would not have any need to print such information. Id. at 187:12-21.[14]

There is no evidence that Nagel distributed or otherwise shared these documents beyond sending them to his personal email address.

---

[13]   Nagel disputes this in his affidavit, but this denial is not supported by any other evidence or examples from Nagel's own testimony. Without other record evidence, Nagel's own assertions are not enough to defeat summary judgment because "self-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment." Kobrand Corp. v. Abadia Retuerta S.A., No. 12-CV-154 (KBF), 2012 WL 5851139, at *4 (S.D.N.Y. Nov. 19, 2012) (citing BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir. 1996)). Nagel also asserts that two other Zurich entities had a policy that required the board directors of those entities to retire after age 70, see ECF No. 73 ¶ 27, and that this is a material fact to his claims of age discrimination; however, as the Court decided in dismissing Nagel's counterclaims against those two Zurich entities on 12(b)(1) and 12(b)(6) grounds, that policy never applied to Nagel, and was not even in effect by the time Nagel's employment was terminated. See ECF No. 87. Nagel does not point to record evidence to indicate any connection between this policy and the termination of his employment.

[14]   Zurich states that while employees were working remotely due to the COVID-19 pandemic, Zurich issued and disseminated guidance to employees regarding printing from home securely. ECF No. 97-42. Nagel disputes that this was ever distributed to employees or that it represented any set of binding rules.

On November 3, 2020, Urban completed his review of Nagel's printing for the year 2020 and concluded that Nagel had performed approximately 342 print jobs for personal non-work-related reasons, totaling 3,469 pages.

### iii. Pappas's Conversations with Nagel

Pappas scheduled a time to speak with Nagel on October 29, 2020. Pappas testified that she sought to validate with Nagel the hours he had reported and the hours he had been paid for.[15] Pappas took contemporaneous notes during her October 29, 2020 call with Nagel, providing, inter alia, that Nagel admitted that his time entries in Sharepoint and GEMS did not match, claimed that his large amounts of overtime were based on an unwritten "agreement" to get his salary higher to what it was prior to his 2011 re-hire, and that he had been driving from New York to Florida. Nagel first stated that he had moved over a weekend, then, when asked about the VPN report showing that he had logged in during the work week in different states, said that he was "able to stay connected" during the week and "handled things" from 6:45 a.m. to 9:00 p.m. while driving. After the first call ended, Nagel called Pappas

---

[15]   Nagel disputes that she proceeded in good faith to do so.

back, and said that his wife drove to Florida and he sat in the back seat and worked.[16]

On November 4, 2020, Pappas called Nagel again. She testified (and provided in her notes) that this was to discuss additional findings she learned from the CISS investigation.[17] Pappas's version of the call is that Nagel refused to answer her questions and said he was "not comfortable" providing her with the information requested; Nagel testified that he objected to Pappas lying to him about the reason for her calls and clearly attacking his conduct without listening to his explanations. See ECF No. 112 at 43-44. Pappas then called Carty to discuss.

D. Termination of Nagel's Employment

Nagel's employment was terminated on November 5, 2020.[18] Pappas prepared talking points for Carty surrounding the termination; she also prepared the termination letter from a

---

[16]    Nagel argues that Pappas's notes and the information contained therein are inadmissible evidence because they are hearsay to which no exception applies. But to the extent that they record Nagel's answers, they would seem to qualify for admission under Fed. R. Evid. 801(d)(2)(B).

[17]    See footnote 16, supra.

[18]    Plaintiffs assert that Carty made an independent decision to fire Nagel, based on Carty's and Pappas's deposition testimony; Nagel argues that Pappas instructed Carty on behalf of Zurich to terminate Nagel, citing Carty's deposition. ECF No. 112 at 45; ECF No. 114-5 at 175:20-21.

template. Carty set up a date and time for a discussion with Nagel to advise him of the termination of his employment. During the call, Carty advised Nagel of the termination of his employment, and Pappas provided information regarding final pay and benefits.

Nagel's termination letter explained that his employment was being terminated because "[a] recent internal review resulted in concerns around falsification of documents, your use of company resources during working hours for non-business activities and evidence of your sending Confidential Proprietary documents to your personal email address." ECF No. 22-2. The letter further states that "[a]ttempts were made to get additional information" from Nagel on October 29, 2020, but that "information provided by [Nagel] on October 29, 2020 included conflicting information and a change in stories," and that when additional attempts were made on November 4, 2020 to speak with Nagel to obtain additional information, he "expressed [his] unwillingness to cooperate, and [he] would not answer questions." Id. The letter concludes that "[Nagel's] actions and [Nagel's] failure to be forthcoming in the review process violate Company policy and therefore, effective immediately, [his] employment is being terminated." Id.

On November 6, 2020, Zurich sent a letter to Nagel that demanded, inter alia, that Nagel return all hard-copy documents containing Zurich confidential and proprietary information and

submit his computer, phone, and other electronic devices, as well as his personal email account(s), for imaging and forensic analysis to ensure the return of all Zurich confidential and proprietary information. See ECF No. 97-46.

On November 11, 2020, Nagel's then-attorney, Thomas Budd, contacted counsel for Zurich and confirmed receipt of Zurich's November 6 letter but declined to return the documents or submit Nagel's computer to forensic inspection. Budd stated that Nagel would "provide assurances that there is no Company material on his personal Computer" if Zurich agreed to provide Nagel severance pay and "clear" Nagel's "record" regarding the termination of his employment. ECF No. 22-4.

Zurich continued, following Nagel's termination, to document the issues uncovered in its investigation, including further investigating the company laptop that he returned following his termination. See ECF No. 97-34.

In mid-December 2020, Zurich terminated Carty's employment for, inter alia, his failure to properly supervise Nagel.


## II.  Procedural Background

On November 5, 2020, plaintiff ZALICO fired defendant/counter-claimant Jon Nagel, accusing him of, inter alia, falsifying timesheets. On December 29, 2020, Nagel filed an age

discrimination suit in New York state court against ZALICO and fifteen other Zurich entities, plus two individual Zurich employees involved in his termination, Patrick Carty and Cheryl Pappas. On December 30, 2020, ZALICO filed suit in this Court, bringing a claim under the Defend Trade Secrets Act ("DTSA") as well as breach of contract, breach of fiduciary duty, and unjust enrichment claims.

The Court originally had federal question jurisdiction. On Nagel's first motion to dismiss, the Court dismissed the DTSA claim for failure to state a claim as well as the unjust enrichment claim. See ECF No. 21.[19] The dismissal was without prejudice to the unjust enrichment claim being refiled as a fraud claim, which ZALICO then did, joining co-plaintiff ZNA Services, LLC in its amended complaint. See ECF No. 22. Because the sole federal cause

---

[19]    In the Court's first order denying Nagel's motion to dismiss the complaint, the Court concluded with regard to the breach of contract claim that the Proprietary Information policy "does not explicitly forbid a current employee from sending proprietary information to his personal email account, nor does it explicitly require a terminated employee to submit to a forensic inspection of his personal devices." See ECF No. 21 at 18. With regard to the DTSA claim, the Court went on to find that plaintiffs only accuse Nagel of doing so beginning in March 2020, "at the outset of the coronavirus pandemic, when most employees had to work from home" and that "[g]iven that emailing documents to oneself does not violate the plain language of the contract, plaintiffs had not plausibly alleged that Nagel's pandemic-limited practice of emailing documents to himself was an improper 'use' of company documents sufficient to constitute 'misappropriation' of a trade secret." ECF No. 21 at 15 n.1.

of action had been dismissed, Nagel then moved to dismiss the case for lack of subject matter jurisdiction and to dismiss the fraud claim for failure to state a claim. In a July 2021 order, the Court found diversity jurisdiction lacking, but ultimately elected to exercise supplemental jurisdiction over the remaining claims; the Court also denied Nagel's motion to dismiss the fraud claim. See ECF Nos. 35, 39.

The parties then made a joint telephone application: given that the Court chose to exercise supplemental jurisdiction, the parties preferred to keep all claims in federal court to avoid overlapping discovery on the same issues. The Court granted Nagel leave to file his answer and counterclaims that would include the claims and parties who were defendants in the state suit.

Nagel filed his counterclaims on July 23, 2021, alleging age discrimination and retaliation claims under the New York State Human Rights Law ("NYSHRL"), a retaliation claim in violation of the New York City Human Rights Law ("NYCHRL"), defamation, and tortious interference with employment. ECF No. 26. On September 14, 2021, Nagel amended his counterclaims to add discrimination and retaliation claims under the Age Discrimination in Employment Act ("ADEA"). ECF No. 63 ¶¶ 134-84.

The parties have now filed cross-motions for summary judgment. See ECF Nos. 93, 98.

-23-

**LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).[20] The moving party bears the burden of demonstrating the absence of any genuine dispute as to any material fact. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). In determining whether there is a genuine dispute as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." Liberty Lobby, 477 U.S. at 255. The same standards apply when the parties file cross-motions for summary judgment. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) ("[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each

---

[20]   Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

case all reasonable inferences must be drawn against the party whose motion is under consideration.").

## DISCUSSION

The Court first addresses plaintiffs' affirmative claims against Nagel for breach of contract, breach of fiduciary duty, and fraud, and finds that summary judgment is not properly granted in favor of either party; these claims must proceed to a jury. The Court then addresses Nagel's counterclaims for defamation, tortious interference, age discrimination, and retaliation; the Court finds that there is no genuine issue of material fact and that summary judgment in favor of plaintiffs is warranted as a matter of law.

## I. Plaintiffs' Affirmative Claims Against Nagel

The Court addresses plaintiffs' breach of contract, breach of fiduciary duty, and fraud claims in turn.

### A. *Breach of Contract*

To prevail on a breach of contract claim, plaintiffs must establish (1) Nagel's obligations under the Proprietary Information Agreement; (2) adequate performance by Zurich; (3) Nagel's breach of the Agreement; and (4) resulting damages. See Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). Nagel does

not dispute the existence of his obligations under the Agreement, that Zurich adequately performed, or that he breached, arguing only that plaintiffs have not established adequate damages, only speculative ones.

Under the Agreement, Nagel agreed that, both during and after his employment at Zurich, he would not "disclose, use for [himself] or others, make unauthorized copies of, . . . or take with [him]" any Zurich "proprietary information," which the Agreement defines as including "information of a business nature," including Zurich's financial, planning, and organizational data. ECF No. 96 ¶¶ 24-26. Under the Agreement, Nagel also agreed that at the request of Zurich or upon the termination of his employment, he would "immediately return all Proprietary Information," including in "electronic medium." Id. ¶ 27.

Neither party disputes that the Agreement is valid and enforceable. Plaintiffs argue that Nagel violated the terms of Zurich's Proprietary Information Agreement by emailing to himself "tak[ing] with [him]" over 60 documents containing "Zurich confidential and proprietary information," thereby "tak[ing] with [him]" such documents, as well as by maintaining these materials on his personal device(s) and neither returning the information nor submitting those device(s) to a forensic inspection to ensure proper containment, thereby not "immediately return[ing]" them

after his termination. The 60 documents included corporate governance documents, board resolutions, financial reports, and biographical affidavits containing sensitive personal information for senior Zurich executives. Id. ¶¶ 93-99.

As to damages, plaintiffs have raised a genuine issue of material fact as to the existence of damages so as to survive Nagel's motion for summary judgment on this claim; while the evidence of actual damages is speculative, summary judgment in favor of Nagel is not warranted where nominal damages may be available at trial and where plaintiffs request injunctive relief. Accordingly, the Court denies both parties' motions for summary judgment; plaintiffs' breach of contract claim must go to a jury.

To establish actual damages, plaintiffs must come forward with evidence to establish the existence of actual damages that they suffered that were directly and proximately caused by Nagel's breach. See Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004). Speculative or conjectural theories of damage are insufficient. See Planete Bleue Television, Inc. v. A&E Television Networks, LLC, No. 16-CV-9317 (PGG), 2018 WL 10579873, at *15 (S.D.N.Y. Sept. 19, 2018); House of Europe Funding I, Ltd., v. Wells Fargo Bank, N.A., No. 13-CV-519 (RJS), 2014 WL 1383703, at *10 (S.D.N.Y. Mar. 31, 2014). For purposes of summary judgment, plaintiffs need not, however, prove the exact amount of such

damages. See, e.g., Boyce v. Soundview Tech. Grp., Inc., 464 F.3d 376, 391 (2d Cir. 2006) ("[A] plaintiff need only show a stable foundation for a reasonable estimate of damages to which he is entitled as a result of the breach."); id. at 392 (finding that if a defendant challenges a plaintiff's claim to damages, it is the defendant "who must shoulder the burden of the uncertainty regarding the amount of damages").

Plaintiffs advance three theories of actual damages, all of which are speculative, but plaintiffs do create a genuine dispute of material fact sufficient to survive summary judgment; as discussed further infra, the possibility of nominal damages and the request for injunctive relief make summary judgment in favor of Nagel inappropriate.

First, plaintiffs assert that Nagel's failure to return the above-described documents in violation of the Proprietary Information Agreement has caused them damages generally, including "loss of its goodwill, confidence of its customers and insureds, and reputation in the industry." See ECF No. 96 ¶¶ 93-94, 116. Nagel argues that even plaintiffs' Rule 30(b)(6) witness, whom they offered as proof of damages, could not specifically identify any lost income, business opportunity, clients, or personnel. See ECF No. 102 ¶¶ 69-73. Nagel argues that, at most, the witnesses speculated about harm that might occur. See, e.g., ECF No. 104-17

at 159:10-12 (Pappas testifying that "the possibilities are endless"). While establishing damages stemming from the risks of exposure of confidential information poses some challenges, plaintiffs do not present more than speculative evidence of loss of goodwill, confidence, or reputation.

Second, plaintiffs assert more specifically that their damages include the "irreparable harm caused by the disclosure of highly sensitive personal information of its senior executives." ECF No. 95 at 5. The evidence plaintiffs point to of such harm is that the biographical affidavit of Zurich executive Laura Lazarczyk, which was among the materials that Nagel sent to his personal email address, contained "everything somebody need[ed] to steal [her] identity," and that Lazarczyk has received two notifications in the past year for unemployment claims in her name that she did not file. ECF No. 96 ¶ 95. But without more, it is merely speculation that these fraudulent unemployment insurance claims might have been connected to the emails Nagel sent to himself; in any event, this harm was suffered by Lazarczyk personally, not by plaintiffs. It is too speculative to establish actual damages for plaintiffs to posit, without any other evidence, that the fraudulent unemployment insurance claims filed in Lazarczyk's name were directly and proximately caused by the emails Nagel sent to himself.

Third, plaintiffs argue that because Nagel refused to comply with his obligations under the Proprietary Agreement and "immediately return" Zurich confidential information following the termination of his employment, Zurich was forced to file the instant litigation and incur the associated costs and attorneys' fees in order to retrieve the information to prevent future harm. See ECF No. 96 ¶¶ 27, 108-12. But plaintiffs provide no case citations to support such an argument. While, as a practical matter, plaintiffs are right that but for Nagel's breach, they would not have brought the instant lawsuit seeking return of its proprietary information, a rule that would allow attorneys' fees in the instant litigation alone to satisfy the damages element would be overbroad, effectively negating the requirement.

While plaintiffs' evidence of actual damages is speculative, the question is whether plaintiffs have raised a genuine issue of material fact as to the existence of damages. See Ventura Assocs., Inc. v. Int'l Outsourcing Servs., Inc., No. 04-CV-10250 (PKL), 2008 WL 2073628, at *6 (S.D.N.Y. May 14, 2008) (finding that defendant could prevail in contesting actual damages "only if [plaintiff] has failed to raise a genuine issue of material fact as to the existence of alleged damages"). Given the availability of nominal damages and/or injunctive relief, summary judgment in Nagel's favor is not warranted.

-30-

Turning to nominal damages, it is appropriate to deny a defendant's motion for summary judgment on the issue of damages where, even if the plaintiff has not proven actual damages, nominal damages could be awarded. See Martell Strategic Funding LLC v. Am. Hosp. Acad., No. 12-CV-627 (VSB), 2019 WL 632364, at *7 (S.D.N.Y. Feb. 14, 2019); Alpha Cap. Anstalt v. Real Goods Solar, Inc., 311 F. Supp. 3d 623, 632 (S.D.N.Y. 2018); Medinol Ltd. v. Bos. Sci. Corp., 346 F. Supp. 2d 575, 599 (S.D.N.Y. 2004); V.S. Int'l, S.A. v. Boyden World Corp., No. 90 CIV. 4091 (PKL), 1993 WL 59399, at *8 (S.D.N.Y. Mar. 4, 1993).

Nagel attempts to distinguish such cases by arguing that in those cases, as compared to here, there was more specific evidence from which a jury could conclude that the breach caused damages. See Martell, 2019 WL 632364, at *2 (agreement provided for specific payments); Alpha, 311 F. Supp. 3d at 632 (evidence regarding stocks quantifiable); Medinol, 346 F. Supp. 2d at 599 (evidence of lost profits attributable to breach); V.S. Int'l, 1993 WL 59399, at *8 (factual issues with respect to $1,000,000 claim of actual damages for expenses and lost revenues). Nagel's attempt to distinguish plaintiffs' cases is effective insofar as the breach of contract claims in all of the cases cited by plaintiffs more clearly survived summary judgment on the issue of damages -- but this does not necessarily mean that summary judgment on plaintiffs' breach

-31-

of contract claim is warranted where the issue of damages is a close question, and it does not mean that nominal damages would not be available to plaintiffs at trial. See Raymond Weil, S.A. v. Theron, 585 F.Supp.2d 473, 488 (S.D.N.Y. 2008) ("It is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of the loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any.").

Plaintiffs also request specific performance or injunctive relief, in the form of an order enjoining Nagel from possessing Zurich proprietary information and requiring him to submit to a forensic inspection of his personal devices and email account. ECF No. 22 at 17. The damages element is satisfied for summary judgment purposes where a defendant fails to return information at the end of his employment, in violation of an agreement, and where the plaintiff former employer requests a permanent injunction ordering the defendant former employee to relinquish all of the plaintiff's documents. See Schanfield v. Sojitz Corp. of Am., 663 F. Supp. 2d 305, 348 (S.D.N.Y. 2009). As the court reasoned in Schanfield, summary judgment is inappropriate in this context.

Plaintiffs have established Nagel's obligations under the Proprietary Information Agreement, which, at minimum, included

-32-

immediately returning the materials Nagel had in his personal email and on his personal devices; adequate performance by Zurich; and Nagel's breach of the Agreement by sending Zurich proprietary information to his personal email and not immediately returning such material upon the termination of his employment. While plaintiffs' evidence regarding actual damages is fairly nonspecific, it is understandable that plaintiffs may have a hard time tracing the damages resulting from Nagel's breach because of the nature of the risk in unsecured transmission of confidential information (and the ongoing risk of maintaining confidential information on unsecured devices or accounts). This challenge inherent in the nature of such a breach should not allow Nagel to avoid liability altogether, particularly where plaintiffs ask for specific performance and injunctive relief as a remedy, and where nominal damages may be available. There remains a genuine dispute of material fact as to damages and summary judgment in favor of either party on this claim is not warranted.

### B. *Breach of Fiduciary Duty*

To establish breach of fiduciary duty, plaintiffs must establish "(1) that a fiduciary duty existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages as a result of the breach." Meisel v. Grunberg, 651 F. Supp. 2d

98, 114 (S.D.N.Y. 2009). The parties dispute whether, under New York law, an at-will employee like Nagel owed a fiduciary duty to his employer, and what breach requires plaintiffs to establish.

Nagel owed Zurich a fiduciary duty in his role as a Corporate Secretary and paralegal, even as an at-will employee. See Nielsen Co. (US), LLC v. Success Sys., Inc., No. 11-CV-2939 (LAP), 2013 WL 1197857, at *9 (S.D.N.Y. Mar. 19, 2013) ("As a matter of law, an employee owes a fiduciary duty to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost faith and loyalty in the performance of his duties."). This duty "may continue after termination of the employment relationship." Am. Fed. Grp., Ltd. v. Rothenberg, 136 F.3d 897, 914 (2d Cir. 1998).

As for breach, it is useful to consider each of plaintiffs' arguments in turn. First, plaintiffs argue that Nagel breached by taking Zurich confidential information (60 documents that included corporate governance documents, board resolutions, financial reports, and biographical affidavits containing sensitive personal information for senior Zurich executives, see ECF No. 96 ¶¶ 93-99), and emailing it to his personal account, retaining that information after his employment was terminated, and exploiting that information to try to leverage a severance package. But Nagel emailing the documents to his personal account was not breach, nor

-34-

was simply retaining those documents after his employment was
terminated, because there is no evidence that he has shared those
documents with any Zurich competitors, or with anyone other than
his lawyer. See Veritas Cap. Mgmt. L.L.C. v. Campbell, 875 N.Y.S.2d
824 (N.Y. Sup. Ct. 2008), aff'd sub nom. Campbell v. McKeon, 75
A.D.3d 479 (N.Y. 2010), and aff'd as modified, 82 A.D.3d 529 (N.Y.
2011).

Plaintiffs further argue that because Nagel tried to exploit
Zurich's confidential information to try to leverage a severance
package, see ECF No. 96 at ¶ 111, he breached his fiduciary duty
to Zurich not to "exploit to the former employer's detriment"
confidential information. Rothenberg, 136 F.3d at 914. But the
court in Rothenberg found that a breach of loyalty required a
showing that the employee used confidential information to compete
with his former employer, not simply to obtain money from his
former employer for his own benefit. See id. at 906. Because Nagel
did not use the information to compete or divert business
opportunities from Zurich, simply sending and keeping the
information is not breach of fiduciary duty. While it is difficult
to conclude that Nagel's improper retention and use of proprietary
information to try to leverage a severance package from his former
employer is consistent with "exercis[ing] the utmost faith and
loyalty in the performance of his duties," Nielsen, 2013 WL

1197857, at *9, there is no evidence in the record to support the assertion that Nagel misappropriated or utilized the information in any way to try to compete with Zurich's business or otherwise divert business opportunities to Zurich's benefit. Nagel's retention of Zurich's confidential information, without any further action beyond trying use it to leverage a severance package in the instant litigation, does not constitute a breach of the fiduciary duty an employee owes a former employer; to hold otherwise would be to so broadly construe the duty as to cover any conduct by which a former employee acted against the former employer's interest.

Second, plaintiffs argue that Nagel breached his fiduciary duty by falsifying timecards to obtain excess overtime pay to which he was not otherwise entitled. Nagel's response is twofold: that there is not sufficient evidence that Nagel falsified his timesheets, and that in any case, Zurich was aware of and tolerated Nagel's timesheet practices, and that this disproves any claim that Nagel breached the duty of the utmost good faith and loyalty he owed to Zurich.

Even drawing all reasonable inferences in Nagel's favor, the record evidence does not demonstrate that Zurich was aware of and tolerated Nagel's timesheet practices. See ECF No. 117 ¶ 8. The fact that Zurich reviewed a few months' worth of Nagel's timecards

from 2014 and 2015 and did not find substantial discrepancies at
that time and chose not to take further action does not mean that
Zurich condoned any misrepresented timecards in the years that
followed, including after Zurich conducted an independent
investigation in 2020.[21] And Nagel was unaware of this 2014-2015
investigation until the instant litigation, forestalling any
argument that he relied on Zurich having overlooked such behavior
in the past. Nagel claims, pointing only to his own declaration,
that the way he completed timecards was based on an "arrangement"
with Zurich; not only is this not supported by any other record
evidence,[22] but it is also contradicted by the fact that Zurich

---

[21]   Nagel further argues that the 2014-2015 investigation found
discrepancies between Nagel's badge swipes and his timecard
records -- the same kind of evidence that the 2020 investigation
uncovered and to which plaintiffs now point as proof that Nagel
falsified his timesheets. Again, the fact that Zurich had
previously looked into Nagel's overtime reporting and concluded
that, at that time, there were not substantial discrepancies
warranting action, does not entail any knowing waiver on the part
of Zurich or prevent it from taking action based on a subsequent
investigation that did uncover substantial discrepancies. And
again, Nagel had no knowledge of the 2014-2015 investigation prior
to the instant litigation, so cannot point to it as proof of any
alleged "arrangement" with Zurich regarding his overtime reporting
practices.

[22]   To try to create a genuine issue of material fact, Nagel
argues that there was an arrangement regarding his timekeeping
practices; however, the only admissible evidence of such an
arrangement, other than statements in Nagel's affidavit, is a
letter from Nagel's ZLS manager Ali Rifai to his superior. ECF No
104-2. Nagel makes much of the Rifai letter's reference to an

investigated Nagel's overtime reporting in 2014-2015 -- i.e., if there were an arrangement, as Nagel asserts, to bill un-worked overtime, Zurich would not have been investigating it in 2014-2015, let alone in 2020.

It is difficult to conclude that Nagel's falsification of his timecards, resulting in Zurich paying him unearned overtime compensation, is consistent with "exercis[ing] the utmost faith and loyalty in the performance of his duties." See Nielsen, 2013 WL 1197857, at *9. Plaintiffs argue that as a matter of plain fact, breach includes where an employee defrauds his employer or engages in deceit to steal from his employer; while the cases cited by plaintiffs are not binding precedent, they are persuasive, and while not factually on all fours, they are consistent with the idea that Nagel's falsification of his timecards, resulting in Zurich paying him unearned overtime compensation, constitutes

---

"arrangement," but it does not support the broad proposition Nagel wishes it to. Rifai's letter indicates that because the hours Nagel was to work for ZLS were to be billed as overtime (because they were beyond the forty hours he was regularly working for ZALICO) not all of his overtime pay was falsified. Rifai's letter certainly supports an argument about the quantity of Nagel's billed overtime hours -- that Nagel worked at least some, and perhaps many, of the overtime hours he billed -- but does not disprove what Zurich's investigation uncovered: that Nagel falsified his timecards by reporting that he was working at times when he was not. Rifai's letter does not support Nagel's claim that Zurich agreed to his practice of filing timecards that did not correspond to the hours when he was working.

breach. See, e.g., Primiani v. Vintage 185 Inc., No. 18-CV-2237
(ADS), 2019 WL 486087, at *4 (E.D.N.Y. Feb. 6, 2019) (finding that
"serious misconduct" did not constitute a breach of fiduciary duty
claim where there were no other facts demonstrating "self-dealing"
by the plaintiffs).

On the one hand, Nagel's retention of Zurich's confidential
information, without any further action beyond trying to use it to
leverage a severance package in the instant litigation, does not
constitute a breach of the fiduciary duty an employee owes a former
employer; to hold otherwise would be to so broadly construe the
duty as to cover any conduct by which a former employee acted
against the former employer's interest. On the other hand, it is
difficult to conclude that Nagel's falsification of his timecards,
resulting in Zurich paying him unearned overtime compensation, is
consistent with "exercis[ing] the utmost faith and loyalty in the
performance of his duties." See Nielsen, 2013 WL 1197857, at *9.
This is a close question, and neither party is entitled to prevail
as a matter of law. The Court thus denies both parties' motions
for summary judgment on plaintiffs' breach of fiduciary duty claim.


### C. Fraud

The elements of fraud are "a material, false representation,
an intent to defraud thereby, and reasonable reliance on the

-39-

representation, causing damage to plaintiff." <u>Chanayil v. Gulati</u>,
169 F.3d 168, 171 (2d Cir. 1999). Plaintiffs argue that Nagel made
a series of material misrepresentations with the intent to defraud
his employer by submitting falsified timecards, and that by
misrepresenting the time he worked in order to receive overtime
compensation that he did not earn, his misrepresentations were
material because they were the basis for Zurich's payments to Nagel
that he was not entitled to and would not have received but for
the fraud.

Nagel, in turn, argues that plaintiffs cannot prove by clear
and convincing evidence that Nagel made material representations
with the intent to defraud or that Zurich reasonably relied on
Nagel's alleged misrepresentations. Nagel's principal argument is
that Zurich "ha[d] the means to discover" the true nature of
Nagel's timecards "by the exercise of ordinary intelligence" but
failed to make use of those means, <u>JP Morgan Chase Bank v. Winnick</u>,
350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004), and that a "heightened
degree of diligence is required" because Zurich "had hints of its
falsity," <u>Banque Franco-Hellenique de Commerce Intern. et
Maritime, S.A. v. Christophides</u>, 106 F.3d 22, 26 (2d Cir. 1997).

The Court addresses intent and reasonable reliance in turn.

1. Intent

The intent element may be shown where a plaintiff demonstrates an intentional or reckless misstatement made with the intent that plaintiff rely on it, Taylor Precision Prod., Inc. v. Larimer Grp., Inc., No. 15-CV-4428 (ALC), 2018 WL 4278286, at *20 (S.D.N.Y. Mar. 26, 2018), or by evidence of the defendant's motive and opportunity to commit fraud or "conscious misbehavior or recklessness," Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006); see also King County v. IKB Deutsche Industriebank AG, 916 F.Supp.2d 442, 447-48 (S.D.N.Y. 2013).

Nagel argues that no reasonable jury could find by clear and convincing evidence that Nagel intended to defraud Zurich because the evidence does not plausibly support that inference: as of 2013, Nagel spent the first part of the day doing his work for ZALICO and the second part of the day doing his work for ZLS, ECF No. 102 ¶¶ 8-9; his timecards were not intended to be precise recording of the hours he arrived and left the office, id. ¶¶ 12-13, 19, 25, 32-33; his supervisor testified that Nagel was frequently in the office early or late, id. ¶¶ 33; Nagel did work on weekends and after 9:00 p.m. that he did not include on his timesheet (which Nagel argues gives rise to the inference that he did not intend to defraud Zurich based on the fact that this "shorted" him pay for additional work), id. ¶¶ 12-13, 19, 25, 32-33; Zurich's 2014-2015

-41-

investigation into Nagel's timecards and corresponding badge swipe records did not uncover substantial discrepancies, id. ¶¶ 15-32; Nagel notated his summer Friday hours on his timecards; and Nagel explained his timecard practices when asked, id. ¶ 38.

Plaintiffs counter that the evidence demonstrates the scienter requirement because (a) Nagel admitted that he purposely misstated his summer Friday hours with the intent that Zurich rely on them and pay him accordingly, see ECF No. 100 at 5; ECF No. 105 ¶ 39; and (b) Nagel's own testimony shows that he acted recklessly in filling out and submitting his timecards, admitting that his timecards "never aligned" with the time he actually worked, that his timecards were not precise, and that he "freely noted the addition of hours" that he did not work, ECF No. 100 at 4, 23.

Even drawing all reasonable inferences in favor of Nagel, a reasonable juror could find that this constitutes recklessness or conscious misbehavior; however, a reasonable juror could also find that this was merely careless or negligent. Summary judgment is thus not appropriate in favor of either Nagel or plaintiffs.

2. Zurich's Reasonable Reliance

Courts consider a variety of factors in evaluating whether a plaintiff's reliance was reasonable, including "whether the plaintiff received any 'clear and direct' signs of falsity, whether the plaintiff had access to relevant information, whether the

-42-

plaintiff received a written (purported) confirmation of the truthfulness of the representations at issue, and whether the plaintiff is 'sophisticated.'" De Sole v. Knoedler Gallery, LLC, 139 F. Supp. 3d 618, 642-43 (S.D.N.Y. 2015).

Plaintiffs argue that their reliance was reasonable primarily because Zurich demanded and received assurance on every timecard in the form of Nagel's express attestation in submitting the timecard that it was accurate and acknowledging the consequences for falsification. See, e.g., Levi v. Commonwealth Land Title Ins. Co., No. 09-CV-8012 (SHS), 2013 WL 5708402, at *8 (S.D.N.Y. Oct. 21, 2013) ("[W]here a plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry." (quoting DDJ Mgmt., LLC v. Rhone Grp. L.L.C., 15 N.Y.3d 147, 154 (N.Y. 2010)).

Plaintiffs also argue that its reliance was reasonable because the misrepresented hours worked were "peculiarly within [Nagel's] knowledge" insofar as "the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty." De Sole, 139 F.Supp. 3d at 642. Plaintiffs argue that Nagel self-reported his time, including when he was allegedly working remotely, and that, although it made efforts to monitor Nagel's time working, Zurich could not as a practical matter

-43-

monitor Nagel's time working every minute of every day, and that Zurich thus justifiably relied on Nagel to correctly enter the time he was working.

Nagel argues that plaintiffs cannot prove reasonable reliance because Nagel's purported misrepresentations were "evident at a glance" of his timecards, and Zurich's 2014-2015 investigation did not lead Zurich to conclude that there was wrongdoing or to take action, even though that investigation also discovered that Nagel's timecards did not match the badge swipe records. Nagel also argues that at Zurich, supervisors are expected to regularly double-check their subordinates' weekly overtime, and should thus be expected to discover any misrepresentations. See ECF No. 112 ¶ 45.

Plaintiffs argue that the limited audit in 2014-2015 does not, as a matter of law, immunize Nagel's fraud, and that Zurich's comprehensive investigation in 2020 demonstrates that it was diligent in its efforts to ensure Nagel's time reporting was accurate. See JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 409 (S.D.N.Y. 2004) (rejecting argument that reliance was not reasonable because plaintiffs had the "means" to discover the alleged falsehood because they had access to the underlying materials that "should have aroused suspicion," distinguishing this from cases where the plaintiff "utterly failed to examine the

-44-

defendant's representations"). The 2014 audit involved a few employees looking at about six months of badge-access records. ECF No. 104-4. In contrast, Zurich's comprehensive investigation in 2020 included two teams (CISS and Employee Relations) conducting not just a review of badge-access records, but also analysis of Nagel's log-in/log-out activity on Zurich servers, VPN connections, payroll information, and years of timesheet entries, as well as interviews with Nagel. ECF No. 96 ¶¶ 54-89.

Nagel asserts in his declaration that his timecard practices were an "arrangement," see ECF No. 113 ¶¶ 33-34, 36, 39, 45. Plaintiffs argue that Nagel's assertion of an "arrangement" is based only on Nagel's declaration, without corroborating witness testimony or any documentary evidence,[23] that this does not create a genuine dispute of material of fact, and summary judgment in Nagel's favor is not appropriate where plaintiffs' evidence places it squarely in dispute, see ECF No. 107 ¶¶ 8-13. See Madeira v. United Talmudical Acad. of Kiryas Joel, 351 F. Supp. 2d 162, 167 (S.D.N.Y. 2004) (finding summary judgment grant inappropriate where it would be based solely on "the self-serving affidavit of

---

[23]   To try to create a genuine issue of material fact, Nagel argues there was an arrangement regarding his timekeeping practices; however, as discussed above, Rifai's letter does not support Nagel's claim that Zurich agreed to his practice of filing timecards that did not correspond to hours when he was working. See supra n.24.

[defendant]"). Nagel argues that his declaration is supported by other evidence, including that Zurich was aware of Nagel's overreporting in at least some months of 2014-2015 and took no action, ECF No. 102 ¶¶ 10-23, and that Nagel's supervisors reviewed and were aware of his reporting practices and took no action, id. ¶¶ 10-11. This is enough to create a genuine dispute of material fact as to Zurich's reasonable reliance.

Accordingly, plaintiffs' fraud claim must go to a jury. There are genuine issues of material fact as to intent and reasonable reliance. Based on the evidence here presented, whether Nagel acted recklessly or with intent to defraud, as opposed to merely carelessly or negligently, is a jury question. So is whether Zurich's reliance was reasonable under these circumstances.

## II.   Nagel's Counterclaims

The Court first addresses Nagel's tort counterclaims, then turns to the age discrimination and retaliation counterclaims.

### A. Defamation

Nagel asserts his defamation claim against Carty, Pappas, and various Zurich entities[24] on the ground that Carty and Pappas

---

[24]   Nagel's defamation claim is against Zurich Insurance Group Ltd., Zurich American Life Insurance Company, Zurich American Company LLC, and Zurich American Life Insurance Company of New York.

"falsely informed officers of Zurich" that Nagel "had been defrauding the company," in relation to the timecards he filed to be paid for time that plaintiffs argue he was not working. ECF No. 63 ¶¶ 117-18, 165. For a defamation claim, Nagel must establish "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' [Nagel], (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." Vilien v. Dep't of Educ. of City of New York, No. 06-CV-3491, 2009 WL 857458, at *6 (S.D.N.Y. Mar. 31, 2009) (quoting Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001)).

The counter-defendants argue that summary judgment in their favor is warranted on Nagel's defamation claim because (a) he cannot prove actionable falsity when he has even admitted that the statements regarding his timecards were substantially true, and (b) Carty's and Pappas's statements are protected by the common-interest privilege.

First, where the allegedly defamatory statement is true or "substantially true," a defamation claim is legally insufficient. Biro v. Conde Nast, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012). It is Nagel's burden to prove the falsity of the statements. See Leidig v. BuzzFeed, Inc., 371 F. Supp. 3d 134, 143

-47-

(S.D.N.Y.), aff'd, 788 F. App'x 76 (2d Cir. 2019). Nagel argues that the statements regarding his fraud are not true as a matter of law because (as Nagel argued on Zurich's fraud claim supra) Zurich knew of and approved Nagel's timesheet practices. If Carty's and Pappas's statements were that Nagel "committed fraud," then the truth of the statements would turn on the resolution of Zurich's fraud claim.

But Carty's and Pappas's statements were instead that Nagel filed timecards that did not accurately reflect the time he worked, and the evidence demonstrates (and Nagel even admits), see ECF No. 96 ¶¶ 83-86, that these statements are substantially true. Zurich's purported knowledge of Nagel's timesheet practices does not negate the veracity of statements that Nagel's timecards did not match the hours he worked; neither does Nagel's intent negate the veracity of a statement that Nagel's timecards, by his own admission, did not match the hours he worked. As a result, Nagel has not met his burden to prove the falsity of the statements because the substance of Carty's and Pappas's statements was admittedly true. See Tolbert v. Smith, 790 F.3d 427, 440 (2d Cir. 2015). There is no genuine dispute of material fact that Nagel's timecards did not align with the hours he worked. No reasonable juror could consider the evidence and find Carty's and Pappas's statements to that effect were not "substantially true." Summary

judgment in favor of the counter-defendants is thus appropriate on this ground alone.

There is a second independent ground for granting summary judgment in favor of the counter-defendants on this claim. Even where statements are defamatory, under New York law "there exists a qualified privilege where the communication is made to persons who have some common interest in the subject matter." See Foster v. Churchill, 665 N.E.2d 153, 157 (N.Y. 1996). "Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for the employee's discharge, fall within the privilege." Albert, 239 F.3d at 272. The counter-defendants argue that any statements about Nagel's falsification of timecards fall squarely within the common-interest privilege because Carty (Nagel's supervisor and formerly ZALICO's General Counsel) and Pappas (an Employee Relations consultant), along with the Zurich entities charged with defamation, all share a common interest in identifying and addressing inappropriate conduct taken in the course of Nagel's employment that also violated Zurich policies.

Nagel, for his part, argues that the common-interest privilege does not shield defamatory statements made with actual malice, either with knowledge that the statements were false or

with a reckless disregard for their falsity. See Foster, 665 N.E.2d at 157; Huntemann v. City of Yonkers, No. 95-CV-1276 (LAP), 1997 WL 527880, at *8 (S.D.N.Y. Aug. 25, 1997). Nagel argues that summary judgment is thus inappropriate because actual malice is a question for a jury. See, e.g., Patton v. Egan, No. 12-CV-2500 LGS, 2014 WL 4652489, at *10 (S.D.N.Y. Sept. 18, 2014).

But it is Nagel who bears the burden of proving that the person making the statement was motivated solely by malice in order to remove the common-interest privilege, and he has not pointed to evidence creating a genuine issue of material fact here. See Ratajack v. Brewster Fire Dep't, Inc. of the Brewster-Se. Joint Fire Dist., 178 F. Supp. 3d 118, 161 (S.D.N.Y. 2016) (collecting cases). Conclusory allegations or speculation are insufficient to show malice, and a triable issue of fact that must go to a jury only exists if Nagel provides evidence creating a genuine issue of material fact as to malice. See Apionishev v. Columbia Univ., No. 09-CV-6471 (SAS), 2012 WL 208998, at *7 (S.D.N.Y. Jan. 23, 2012). Nagel's argument that the counter-defendants acted with actual malice amounts to a conclusory statement that "[t]here is little question" that the counter-defendants, and particularly Carty, knew of Nagel's timesheet practices, had reviewed them in 2014-2015 and not found substantial discrepancies warranting further action, and nevertheless accused Nagel of committing fraud. This

is insufficient to create a genuine dispute of material fact as to whether any of the counter-defendants acted with malice in making statements about Nagel's fraud. Nagel's claim of malice is simply based on speculation or suspicion, which is insufficient to defeat a claim of common-interest privilege. See Apionishev, 2012 WL 208998, at *10.

On the ground that Nagel did not meet his burden to establish falsity or, alternatively, that the statements were protected by the common-interest privilege and Nagel has not created a genuine issue of material fact as to actual malice, the Court grants summary judgment in favor of the counter-defendants on Nagel's defamation counterclaim.

## B. Tortious Interference

Nagel asserts his tortious interference with contract claim against Carty, Pappas, and various Zurich entities[25] based on the termination of his employment. Under New York law, to establish a tortious interference with contract claim, Nagel must demonstrate "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally

---

[25]   Nagel's tortious interference claim is against Zurich Insurance Group Ltd., Zurich American Life Insurance Company, Zurich American Company LLC, and Zurich American Life Insurance Company of New York.

and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." Albert, 239 F.3d at 274.

The counter-defendants first argue that Nagel cannot maintain a tortious interference with contract claim against Zurich or its affiliates because Zurich is a former employer and Nagel was an at-will employee. See Mahmud v. Kaufmann, 607 F. Supp. 2d 541, 561 (S.D.N.Y. 2009), aff'd, 358 F. App'x 229 (2d Cir. 2009) ("A plaintiff cannot maintain a tortious interference claim against [his] employer . . . . An employer cannot be liable for interfering with its own relationship with its employee."); Levinson v. Primedia Inc., No. 02-CV-2222 (DAB), 2007 WL 2298406, at *11 (S.D.N.Y. Aug. 9, 2007) ("[P]arent corporations may not tortiously interfere with their subsidiaries' contracts."); see also Albert, 239 F.3d at 274 (ordinarily an at-will employee cannot assert a claim for tortious interference with that employment because he has no enforceable agreement). Second, the counter-defendants argue that Nagel cannot maintain a tortious interference with contract claim against Carty and Pappas because he has not shown that they "exceeded the bounds of their authority," as would be required to show a co-worker is liable. See, e.g., Ligaya v. Am. Friends of Hebrew Univ., Inc., No. 96-CV-240 (JGK), 1998 WL 146227, at *9 (S.D.N.Y. Mar. 25, 1998).

Nagel counters that there is an exception if Carty and Pappas acted with actual malice. See Levinson, 2007 WL 2298406, at *11. Actual malice can be shown by recklessness, which "may be found where there are obvious reasons to doubt the veracity of the [speaker] or the accuracy of his reports." Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 688 (1989). Nagel argues that he has presented evidence of recklessness sufficient to show actual malice because Carty knew of the 2014-2015 audit and that ZALICO had not taken additional steps against Nagel; Nagel argues that Carty thus had every reason to doubt the accuracy of the 2020 investigation. But no reasonable juror could find that the 2014-2015 audit supports an inference that Carty, Pappas, or Zurich acted with actual malice when they proceeded to terminate Nagel after conducting an independent and comprehensive investigation in 2020, especially when, for the Zurich entities, Nagel would have to show that the  company was "motivated solely by malice" rather than self-interest or other economic considerations. See, e.g., S&L Vitamins, Inc. v. Australian Gold, Inc., 521 F. Supp. 2d 188, 217 (E.D.N.Y. 2007).

The counter-defendants have established that Nagel cannot maintain a tortious interference with contract claim against the Zurich entities or Carty and Pappas as a matter of law and Nagel has not presented evidence to create a genuine issue of material

fact that any of the counter-defendants acted with malice. The Court thus grants summary judgment in favor of the counter-defendants on Nagel's tortious interference counterclaim.

### C. Age Discrimination

Nagel brings age discrimination claims under the ADEA, NYSHRL, and NYCHRL. Under either of the standards applicable to such claims, Nagel has not created a genuine dispute of material fact and summary judgment in favor of the counter-defendants on these claims is appropriate. The Court considers both standards in turn.

1. McDonnell Douglas Burden-Shifting & But-For Causation

Claims of age discrimination under the ADEA and NYSHRL[26] are analyzed using the McDonnell Douglas three-step burden-shifting

---

[26]  The parties dispute whether the NYSHRL claim should be analyzed under the ADEA "but-for" standard or the more liberal "motivating factor"/mixed-motives standard of the NYCHRL. The NYSHRL was amended, effective August 12, 2019, to direct courts to construe the NYSHRL "liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of [the NYSHRL], have been so construed." N.Y. Exec. Law § 300. The amendment does not have retroactive effect. See McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 68-69 (S.D.N.Y. 2020).

The counter-defendants argue that the 2019 NYSHRL amendment does not apply because the comments Carty made in 2013 are the only evidence, circumstantial or otherwise, that give rise to any inference of discrimination, and that the conduct at issue here thus occurred before the amendment's effective date. See ECF No. 95 at 16. Nagel argues that the termination of his employment

framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

(1973); Dietrich v. City of New York, No. 18-CV-7544 (CM), 2020 WL

4226591, at *6 (S.D.N.Y. July 23, 2020) (citing Gorzynski v.

JetBlue Airways Corp., 596 F.3d 93, 105 (2d Cir. 2010)).

To establish a prima facie case of discrimination under the

McDonnell Douglas framework, Nagel must demonstrate that "1) he

was within the protected age group; 2) he was qualified for the

position; 3) he was subject to an adverse employment action; and

4) the adverse action occurred under circumstances giving rise to

---

occurred after the amendment's effective date, and that the amendment thus applies to this case. See ECF No. 110 at 12. Courts that have considered this question have applied the pre-amendment standard where the "conduct" at issue occurred before the amendment's effective date. See Karupaiyan v. CVS Health Corp., No. 19-CV-8814 (KPF), 2021 WL 4341132, at *7, 11 n.14 (S.D.N.Y. Sept. 23, 2021) (applying ADEA standard to NYSHRL claim because "the conduct alleged here" predated the amendment, where plaintiff alleged multiple adverse employment actions, a number of which occurred prior to the amendment's effective date, even though plaintiff's employment was terminated after the amendment's effective date); see also McHenry, 510 F. Supp. 3d at 68-69 (finding amendment applied to sexual harassment claims because complaint alleged only discrete actions after the effective date of the amendment, and finding Title VII standard applied to retaliation claims because they were based exclusively on conduct predating the amendment).

Here, the conduct straddles the amendment's effective date: Carty's stray comment (as discussed infra, the only piece of evidence supporting an inference of age discrimination) occurred in 2013, the allegedly pretextual investigation occurred in 2020, and Nagel's employment was terminated in 2020. Because the Court finds that Nagel cannot survive summary judgment under either standard, whether the NYSHLR claim is denied for the same reasons as the ADEA claim as opposed to the NYCHLR claim is not determinative.

an inference of discrimination." Terry v. Ashcroft, 336 F.3d 128,
137-38 (2d Cir. 2003) (internal quotation marks and citation
omitted). If Nagel establishes a prima facie case, the burden then
shifts to the counter-defendants to "articulat[e] legitimate,
nondiscriminatory business reasons" for the adverse employment
action. Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000). If
the counter-defendants satisfy their burden of production, then
the presumption raised by the prima facie case is rebutted, such
that the burden of persuasion then shifts back to Nagel to
demonstrate "that the proffered reason was not the true reason for
the employment decision," and that it was instead a pretext for
discrimination. Kovaco v. Rockbestos-Surprenant Cable Corp., 834
F.3d 128, 136 (2d Cir. 2016).

It is not sufficient under the ADEA for Nagel to show that
age was a "motivating factor" in Zurich's adverse action; Nagel
must instead prove that age was the but-for cause of Zurich's
adverse employment decision. Lively v. WAFRA Inv. Advisory Grp.,
Inc., 6 F.4th 293, 302-03 (2d Cir. 2021). But-for causation does
not require that Nagel prove that age discrimination was the only
cause of Zurich's adverse action, but only that his employment
would not have been terminated in the absence of a discriminatory
motive. See Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 846 (2d

Cir. 2013). There can be multiple but-for causes. <u>See</u> <u>id.</u> at 846 n.5.

*a. Prima Facie Case*

Neither party disputes that Nagel was within the protected age group (he was sixty-nine years old when ZALICO terminated his employment and turned seventy shortly thereafter); that he was qualified for the position (he had been performing the duties of the job adequately other than the alleged misconduct that counter-defendants cites as the basis for his termination); or that he was subject to an adverse employment action (his employment was terminated). At issue in determining whether Nagel has made out a prima facie case of discrimination then, is whether the termination of his employment "occurred under circumstances giving rise to an inference of discrimination." <u>Terry</u>, 336 F.3d at 152.

Nagel's argument essentially assumes that he has made out a prima facie case and focuses on arguing that Zurich's legitimate nondiscriminatory reasons are pretextual. It is, however, a close call whether Nagel has made out a prima facie case of discrimination when he points only to one comment made by his supervisor in 2013.

In 2013, Nagel's supervisor Patrick Carty remarked that Nagel
was "too old" to work so much overtime. ECF No. 96 ¶ 36.[27] Nagel
argues that such a disparaging comment about Nagel's age shows
that Zurich terminated him based on his age because he was two
days away from his seventieth birthday. The counter-defendants
argue that Carty's comment is a stray remark with limited probative
value.[28]

---

[27]   Nagel's deposition reports the comment as Carty saying that
Nagel was "too old to work that late at night." See ECF No. 96
¶ 159. Neither formulation of the comment gives rise to a stronger
inference of discrimination than the other -- both clearly refer
to [old] age and could be considered, drawing all reasonable
inferences in Nagel's favor, to refer to inaccurate and offensive
discriminatory tropes about older employees being less able to do
their jobs effectively.

[28]   The counter-defendants advance several unpersuasive
arguments. The counter-defendants argue that because Nagel was re-
hired in 2011, when Nagel was 60 years old, this weighs against
finding any inference of discrimination. In age discrimination,
however, the intervening nine years -- and the difference between
60 years old and 70 years old -- matter. See, e.g., Carlton v.
Mystic Transp., Inc., 202 F.3d 129, 138 (2d Cir. 2000) (finding
that "[t]he seven years between [the employee's] hiring and firing
significantly weakens the same actor inference").
       The counter-defendants also cite various cases where a court
found that even more obviously offensive comments were not
sufficient to get a discrimination suit a jury. But the fact that
more clearly offensive comments, in other factual contexts, did
not give rise to an inference of discrimination does not
necessarily mean that the comment here does not. Finally, Carty
was 56 at the time Nagel's employment was terminated. ECF No. 96
¶ 107. While the counter-defendants argue in passing that some
inference should be drawn from the fact that Carty was also in the
protected age group under the discrimination statutes, any
inference that an older person cannot discriminate against another

Here we have a remark, made by the person who Nagel actually disputes was the ultimate decisionmaker in terminating Nagel's employment,[29] about age that, drawing all reasonable inferences in Nagel's favor, could be understood as referring to inaccurate and offensive discriminatory tropes about older workers. This remark is, however, of limited probative value because it was made seven years before Nagel's discharge without any other evidence connecting it to the discharge, which weakens its probative value in supporting an inference of discrimination. See Henry v. Wyeth Pharms., Inc., 616 F.3d 134, 149 (2d Cir. 2010) (noting that in determining whether isolated "stray remarks" are probative of discriminatory intent, courts should consider that "[t]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination"); see also Mesias v. Cravath, Swaine & Moore LLP, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015) (finding that comments made a year and a half and three months, respectively,

_____

older person is not warranted. See, e.g., Feingold v. New York, 366 F.3d 138, 155 (2d Cir. 2004) (concluding that members of a protected group can discriminate against other members of the protected group on that basis).

[29]   The counter-defendants assert that Carty was the person who made the ultimate decision to terminate Nagel's employment, though Nagel disputes this, asserting that Pappas instructed Carty to terminate Nagel's employment on behalf of Zurich. See ECF No. 112 at 45; ECF No. 114-5 at 175:20-21.

before plaintiff's termination were not sufficient to allege age discrimination).

There is no evidence supporting a causal link between Carty's comment and a termination decision based on information uncovered in an independent investigation into violations of Zurich policy. Carty did not request or initiate the 2020 investigation into Nagel's conduct, which formed the basis of the ultimate grounds for discharging Nagel, nor was Carty involved in any way in the investigation. ECF No. 96 ¶ 71. Nagel even disputes that Carty made the decision to fire him. Without more, this is not sufficient to give rise to an inference that Nagel's termination was based on age. See, e.g., Bohlinger v. Abbott Labs. Inc., 843 F.App'x 374, 379 n.5 (2d Cir. 2021) (summary order) (holding that a single comment asking "how much longer are you going to be around," years before the adverse action, was not sufficient to create reasonable age discrimination inference to preclude summary judgment). Even assuming, however, that this were sufficient to make out a prima facie case, summary judgment in favor of the counter-defendants is warranted because Nagel does not establish any genuine issue of material fact as to pretext, as discussed further below.

b. *Legitimate Nondiscriminatory Business Reasons*

ZALICO contemporaneously gave, in its letter to Nagel terminating his employment, its legitimate nondiscriminatory

-60-

business reasons for Nagel's discharge. Nagel's termination letter explained that his employment was being terminated because "[a] recent internal review resulted in concerns around falsification of documents, your use of company resources during working hours for non-business activities and evidence of your sending Confidential Proprietary documents to your personal email address." ECF No. 22-2. The letter further states that "[a]ttempts were made to get additional information" from Nagel on October 29, 2020, but that "information provided by [Nagel] on October 29, 2020 included conflicting information and a change in stories," and that when additional attempts were made on November 4, 2020 to speak with Nagel to obtain additional information, he "expressed [his] unwillingness to cooperate, and [he] would not answer questions." Id. The letter concludes that "[Nagel's] actions and [Nagel's] failure to be forthcoming in the review process violate Company policy and therefore, effective immediately, [his] employment is being terminated." Id.

The counter-defendants repeat these same grounds in briefing in this case. ZALICO terminated Nagel's employment following a thorough investigation by the CISS team and Employee Relations that revealed that Nagel had reported time and received overtime compensation for time he did not work, sent confidential documents to his personal email address outside of Zurich's secure network,

and used company resources during working hours for non-business activities. <u>See</u> ECF No. 96   ¶¶ 55, 68, 72-89, 91-95. Zurich's company polices prohibited such conduct. <u>See</u> <u>id.</u> ¶¶ 24-33, 51-52. ZALICO was not required to present its case to Nagel and secure his admission of wrongdoing before terminating his employment, though Nagel does admit to making false time entries, and though ZALICO did attempt to question Nagel about the conduct, only to have him give conflicting stories and then refuse to answer further questions. <u>See, e.g.</u>, <u>Droutman v. N.Y. Blood Ctr., Inc.</u>, No. 03-CV-5384 (DRH), 2005 WL 1796120, at *8 (E.D.N.Y. July 27, 2005) (finding that an employee's falsification of her time sheets, reported hours, or attendance records is an undeniably legitimate and non-discriminatory reason for terminating her, even if employee did not admit to it).

    *c. Pretext*

Nagel advances four arguments that ZALICO's reasons for terminating his employment were pretext: (1) because Zurich had previously looked into Nagel's timekeeping practices in 2014-2015 and had not taken action at that time, citing Nagel's timekeeping practices after the 2020 investigation as a reason for terminating his employment was covering for age discrimination; (2) because many of the grounds on which "Zurich claims it fired Nagel" were inaccurate and known by Zurich to be inaccurate, the reasons given

were covering for age discrimination; (3) because the 2020
investigation was "obviously skewed" and rife with procedural
deficiencies, it was manufactured to cover age discrimination; and
(4) that "comparative evidence," contrasting Nagel at 64 years old
with Nagel at 69 years old, shows that the 2020 investigation was
pretext for age discrimination. Nagel does not point to record
evidence to create a genuine issue of material fact that the
reasons Zurich actually cited in its termination letter to Nagel
were pretext, and none of his remaining pretext arguments are
otherwise availing.

Nagel first argues that ZALICO's termination of Nagel's
employment in 2020 because of his timekeeping practices must have
been pretext because Zurich had previously looked into his
timekeeping practices and had not taken action in 2014-2015.[30] But
no reasonable juror could consider the fact that Zurich conducted
a limited audit in 2014-2015 and did not then choose to terminate
Nagel at that time to support finding that Zurich's later
investigation in 2020 and decision to terminate Nagel based on the
misconduct uncovered in the later investigation was pretext

---

[30]    To try to create a genuine issue of material fact, Nagel
argues that there was an arrangement regarding his timekeeping
practices; however, as discussed supra, Rifai's letter does not
support Nagel's claim that Zurich agreed to his practice of filing
timecards that did not correspond to hours when he was working.
See supra n.24; ECF No 104-2.

covering for age discrimination, where there is no other evidence that the 2020 investigation or decision to fire Nagel was connected to his age.

Second, Nagel points to several other examples of his conduct, states that "Zurich claims it fired Nagel because of them," and then points out that all are baseless. These examples include his drive to Florida, the fact that he sent emails about his wife's gin business on company hours, and that he was putting personal expenses on his company card. But these were never reasons that Zurich gave for firing Nagel. These were not the reasons given in Nagel's termination letter for his employment being terminated, nor were these the reasons given in the counter-defendants' brief as its legitimate nondiscriminatory business reasons. Nagel cites to his lengthy and winding responses in his Rule 56.1 Counterstatement to support his assertions that these were the reasons Zurich claimed it fired him. Nagel is essentially manufacturing disputed facts regarding his termination on issues that his termination letter and Zurich itself never gave as a reason for terminating his employment. This does not show pretext. Pointing to various reasons that Zurich did not give for firing him and saying that they are pretext is at best, a distraction tactic, but does not, in any event, create a genuine dispute of material fact to get Nagel past summary judgment.

Third, Nagel argues that because Zurich's 2020 investigation was "obviously skewed" and rife with procedural deficiencies, it was manufactured to cover age discrimination. Nagel argues that Zurich conducted the investigation after terminating his employment; but a review of the investigation report demonstrates that the investigation was initiated in advance of Nagel's termination and uncovered evidence of the policy violations Zurich cited in its termination letter before Nagel's employment was terminated. See ECF No. 104-15. The fact that the investigation report goes on to document the steps Zurich took to review Nagel's computer, which he returned after his employment was terminated, to try to quantify its loss from Nagel's overbilling and to determine what confidential documents he still retained, is neither surprising nor evidence of pretext. See id. No reasonable juror could draw the inference that the whole investigation was manufactured after "Zurich"[31] had already decided to fire Nagel because of his age, because there is no evidence linking Carty to the investigation at all, or even circumstantially connecting Nagel's age with the investigation or Nagel's termination. Nagel points to no evidence to indicate that the employees actually

---

[31]   Nagel asserts that Carty did not decide to fire him, but that he was directed by Pappas on behalf of Zurich to do so. See ECF No. 112 at 45; ECF No. 114-5 at 175:20-21.

involved in the 2020 investigation -- Lazarczyk, Urban, Dahlborg, or Pappas -- harbored any age-based animus toward him or at all; neither does Nagel present any theory about how age-based animus was present in the investigation.

Fourth, Nagel argues that "comparative evidence" demonstrates that he was treated differently than a younger, but otherwise similarly-situated individual -- himself in 2015. Nagel manufactures a similarly situated individual -- himself in 2015, at age 64, when Zurich did not fire him after the 2014-2015 brief audit of some of his timecards -- compared to himself in 2020, at age 69, when Zurich did fire him after a comprehensive investigation uncovered multiple violations of Zurich policies. While Nagel asserts that the only difference was age, and that the "exact same alleged misconduct" was at issue, such an assertion is without support in the record: the scope of the investigation was different and the underlying violations uncovered were different. The employees involved in initiating and carrying out the 2020 investigation and Nagel's termination were not involved in the 2014-2015 review. ECF No. 96 ¶ 71. Again, Nagel's assertions about the 2014-2015 audit in comparison to the 2020 investigation are simply not supported by the evidence in the record.

While the Second Circuit has repeatedly expressed that caution should be exercised in granting summary judgment to an

-66-

employer in a discrimination case where the merits turn on a dispute as to the employer's intent, the purposes of summary judgment are no less applicable in discrimination cases than in other areas of litigation. Tolbert, 790 F.3d at 434. An employee asserting employment discrimination or retaliation "must do more than simply show that there is some metaphysical doubt as to the material facts," and "must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Nagel must point to evidence sufficient to allow a reasonable jury to find that Zurich's given reason for firing him was a pretext for age discrimination.

Nagel's pretext arguments, however, are not supported by record evidence, and the only admissible evidence he points to is not sufficient for any reasonable juror to conclude that his age was a but-for cause of his termination. No reasonable juror could consider one comment from seven years ago, made by a supervisor who Nagel himself disputes was the person who actually made the decision to fire Nagel, enough to conclude that Zurich terminated Nagel even in part because of his age. Summary judgment in favor of the counter-defendants on Nagel's age discrimination claim under the ADEA and NYSHRL is thus appropriate.

2. Mixed Motives

Under the NYCHRL, however, a "mixed-motive" analysis is applicable. To survive summary judgment on his claims of discrimination under the NYCHRL, then, Nagel must raise a triable issue as to whether age discrimination was a motivating factor for any adverse action, even if it was not the sole motivating factor. See Dietrich, 2020 WL 4226591, at *15. If the counter-defendants establish legitimate reasons for discharging Nagel, Nagel must present specific, factual evidence that he was treated "less well" than other employees, at least in part because of his age. See Mihalik v. Credit Agricole Cheuvreux, N.A., Inc., 715 F.3d 102, 110 (2d Cir. 2013); Richards v. New York City Dep't of Educ., No. 13-CV-16 (VEC), 2015 WL 4164746, at *10 (S.D.N.Y. July 10, 2015).

But even under this more lenient standard, Nagel does not survive summary judgment. A disparaging comment, without more, cannot get a discrimination suit to a jury, even under the more lenient NYCHRL standard. See, e.g., Rinaldi v. Nice, Ltd., No. 19-CV-424 (LGS), 2021 WL 827767, at *9 (S.D.N.Y. Mar. 4, 2021) (finding that a reasonable jury could not conclude, based only on one statement of possible discriminatory intent, that plaintiff's employment was terminated for a discriminatory reason under NYCHRL); see also Kosarin-Ritter v. Mrs. John L. Strong, LLC, 117 A.D.3d 603, 604 (1st Dep't 2014) (finding single comment about

company "going young," after which company hired younger workers, was insufficient to establish pretext for age discrimination claim under NYCHRL). Nagel's unpersuasive arguments about pretext notwithstanding, a single disparaging comment is all that we have here. Carty made the comment in 2013, and it is not otherwise linked to the investigation -- which Carty did not initiate and in which he was not involved -- that provided the basis for the termination of Nagel's employment. Nagel even disputes that Carty was the one who made the decision to fire him.[32] As discussed in more detail above, Nagel has not created a genuine issue of material fact as to any of the arguments he makes as to pretext.

Nagel's sole remaining argument is that under the NYCHRL, if a plaintiff makes a reasonable showing that one of the employer's explanations for the adverse action is false or misleading, the plaintiff is generally entitled to have a jury consider whether the false explanation is evidence of consciousness of guilt or a discriminatory motive. See Brown v. Crowdtwist, No. 12-CV-6110 (HB), 2014 WL 1468145, at *5 (S.D.N.Y. Apr. 15, 2014). But, as discussed supra, Nagel's only arguments that Zurich's explanations for his termination were false or misleading are not based on the reasons Zurich actually gave in its termination letter (or argued

---

[32]   See ECF No. 112 at 45; ECF No. 114-5 at 175:20-21.

-69-

in its briefing in this case) for discharging Nagel -- they are instead based on Nagel's own references to his responses in his Rule 56.1 Counterstatement where Nagel states additional reasons that "Zurich claims" it fired him. Nagel cannot manufacture an employer explanation based on his other possible misconduct, say it was not misconduct, and then call such a reason false or misleading to survive summary judgment on his age discrimination claims.

Nagel must point to evidence sufficient to allow a reasonable juror to find that age was a motivating factor in Zurich's decision to fire him. Here, a comment made seven years prior by the person who Nagel himself argues was not responsible for the decision to fire him, is not enough for a reasonable juror to find that age played a role in Zurich's decision to fire Nagel.

### D. Retaliation

On December 29, 2020, Nagel filed a complaint in New York state court alleging age discrimination under the NYSHRL and NYCHRL. On December 30, 2020, ZALICO filed a separate lawsuit against Nagel in this Court alleging trade secrets, fraud, and unjust enrichment claims. On December 31, 2020, Nagel served the Zurich entities with the Summons and Complaint of the state court action through the New York Secretary of State. When this Court

dismissed the DTSA claim but decided to exercise supplemental jurisdiction over the remaining state law claims in Zurich's action, in July 2020, Nagel filed his age discrimination claims as counterclaims in this suit, adding retaliation claims in violation of the ADEA, NYSHRL, and NYCHRL.

Nagel argues that plaintiffs' lawsuit against him is retaliatory based on the timing of the suit and on Nagel's characterization of plaintiffs' claims as "baseless." The counter-defendants argue that because Nagel was on notice as of November 2020 that Zurich would pursue litigation against him, the timing of the suit does not indicate retaliation, and that the other claims in their lawsuit were and are far from baseless, having survived a motion to dismiss (and now, summary judgment).

To establish retaliation under the NYCHRL, Nagel must show initially that he participated in a protected activity known to the counter-defendants, that the counter-defendants took an action that "disadvantaged" him, and that a causal connection exists between the protected activity and the adverse action. See Cadet-Legros v. New York Univ. Hosp. Ctr., 135 A.D.3d 196, 206 (1st Dep't 2015). The counter-defendants can then rebut a presumption of retaliation by showing legitimate non-retaliatory reasons for their actions. See Ya-Chen Chen v. City University of New York, 805 F.3d 59, 75-76 (2d Cir. 2015). To avoid summary judgment, Nagel

must then show that the alleged adverse actions were "caused at least in part by . . . retaliatory motives." Id. at 76 (citations and quotations omitted).

To establish a retaliation claim under the ADEA or NYSHRL,[33] Nagel must show "that a reasonable employee would have found the challenged action materially adverse," meaning that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Nagel must show that retaliation was the "but for" cause of the adverse employment action, i.e., "that the adverse action would not have occurred in the absence of the retaliatory motive." Duplan v. City of New York, 888 F.3d 612, 625 (2d Cir. 2018) (internal quotation marks and citation omitted). Under either standard, Nagel does not create a genuine issue of material fact as to causation, and summary judgment in favor of counter-defendants on this claim is thus warranted.

Nagel points first to timing, arguing that because plaintiffs could have brought their claims earlier, the fact that they filed the federal suit less than 24 hours after Nagel filed his state court suit (despite not being served until the day after the

---

[33]   Because the Court finds that Nagel cannot survive summary judgment under either standard, whether the NYSHLR claim is denied under the standard applicable to the ADEA claim as opposed to the NYCHLR claim is not determinative.

federal case was filed), necessarily means that plaintiffs'
lawsuit must have been retaliatory. Nagel further argues that
before he filed suit, Zurich was only planning to sue Nagel for
return of Zurich's information, and that it is further proof of
retaliatory intent that when Zurich eventually filed suit, it
included claims for fraud and breach of fiduciary duty.

But Nagel creates no genuine issue of material fact as to
whether the counter-defendants knew of Nagel's state court suit on
December 30, rather than on December 31, when they were served.
And there is no evidence from which a reasonable juror could
conclude that plaintiffs knew of Nagel's state court suit when
they filed their own suit in this Court. ZALICO made clear at the
outset, in its termination letter, that if Nagel did not return
Zurich property and proprietary information, it would violate the
law, and when Nagel did not return Zurich's proprietary
information, Zurich engaged outside counsel within a week after
Nagel's termination.

Ultimately, Nagel does not point to any evidence that
plaintiffs knew of the state court action Nagel filed on December
29, which is less than 24 hours before ZALICO filed its separate
federal action on December 30. ZALICO was not served with notice
of the state court action until December 31. ECF No. 96 ¶¶ 108-
13. An employer must have knowledge of the protected activity to

be able to engage in retaliation, and Nagel does not point to evidence of such knowledge. Nagel asserts that Zurich must have known of the December 29 state court action filing because "its internal legal personnel would receive emails from outside counsel as soon as litigation was filed." ECF No. 112 ¶ 201. This amounts to a generalized inference that lawyers receive emails when cases are filed, that then assumes that Zurich's counsel immediately drafted and filed a complaint in the span of hours. ZALICO does not have to prove that it did not know of Nagel's lawsuit on December 30 when it was not served until December 31, and Nagel does not point to any evidence that Zurich knew of his lawsuit before December 31. Summary judgment in favor of the counter-defendants on Nagel's retaliation claim is therefore appropriate on this ground alone.

Nagel further argues that Zurich's claims are baseless because, were this Court to accept all of Nagel's arguments in ruling on this summary judgment motion, Zurich would have no case. Nagel's argument does not hold water. Plaintiffs' claims survived a motion to dismiss (and now, summary judgment), and are thus neither baseless nor frivolous. And plaintiffs are not estopped from bringing potentially meritorious claims against an employee just because the employee beat them to the courthouse to file a suit of his own, particularly when that employee was on notice

that he faced a lawsuit if he continued to refuse to return Zurich's proprietary information. See Sherman v. Fivesky, LLC, No. 19-CV-8015 (LJL), 2020 WL 5105164, at *6 (S.D.N.Y. Aug. 31, 2020) ("[An] employer should not be required to forfeit a potentially meritorious claim against its employee simply because the employee has brought a claim against the employer."); Grauer v. UBS Finan. Servs., Inc., 07-CV-5450 (LAP), 2008 WL 11398936, at *8 (S.D.N.Y. Dec. 17, 2008) ("[T]o hold otherwise would discourage employers with legitimate claims against employees alleging discrimination from bringing suit, because doing so would inevitably subject them to charges of unlawful retaliation.").

Nagel does not point to any evidence that plaintiffs knew of his lawsuit prior to being served, when ZALICO filed its own lawsuit. Without any evidence of knowledge, Nagel cannot make out causation under either applicable standard for his ADEA, NYSHLR, or NYCHLR claims. The Court thus grants summary judgment in favor of the counter-defendants on Nagel's retaliation claims.

## CONCLUSION

For the aforementioned reasons, and as the Court stated by bottom-line order dated February 28, 2021, see ECF No. 121, the Court hereby denies both parties' motions for summary judgment on plaintiffs' claims for breach of contract, breach of fiduciary

duty, and fraud, but the Court grants summary judgment in favor of counter-defendants on Nagel's counterclaims for defamation, tortious interference, age discrimination, and retaliation. The Clerk is directed to close the entries at docket numbers 93 and 98.

     SO ORDERED.

Dated:   New York, NY

         March 14, 2022         JED S. RAKOFF, U.S.D.J.